[No. S004754. Crim. No. 25938. Apr. 11, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
WILBUR JENNINGS, Defendant and Appellant.

338

COUNSEL

Hugh Anthony Levine, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White, Chief Assistant Attorney General, J. Robert Jibson, Cynthia G. Besemer, Raymond L. Brosterhous II, Ward A. Campbell and Robert R. Anderson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LUCAS, C. J.—Wilbur Jennings was convicted in 1986 of the first degree murders of Linda Johnson, Olga Cannon, and Jacqueline Frazier, and the second degree murder of Karen Robinson. He was also convicted of numerous other felonies against these and three other victims, including a variety of forcible sexual assaults, robberies, arsons, and kidnapping for robbery. In addition, the jury sustained eight special circumstance allegations, finding that Johnson, Cannon, and Frazier were killed in the course of a robbery (Pen. Code, § 190.2, subd. (a)(17)(i); all further statutory references are to this code unless otherwise indicated), that Johnson and Cannon were killed

in the course of a rape (§ 190.2, subd. (a)(17)(iii)), and that defendant had "been convicted of more than one offense of murder in the first or second degree." (§ 190.2, subd. (a)(3).) A Fresno County jury set the penalty at death. The trial court also sentenced defendant to life imprisonment for kidnapping for the purpose of robbery, a consecutive term of 15 years to life for second degree murder, and a total unstayed determinate term of 49 years, 8 months on the remaining felony convictions. This appeal is automatic. (§ 1239, subd. (b).)

FACTS

*Guilt Phase*

1. *Linda Johnson*

Defendant lived in Selma, California, with his half brother, A.C. Harris, and their mother, Artis Williams. Linda Johnson had lived next door with her mother but moved to Long Beach to be with her boyfriend, Melvin Cooper. Defendant was acquainted with Johnson's brother, Flenard Johnson. On several occasions while Linda Johnson was gone, defendant asked Flenard Johnson about Linda's whereabouts. On one of these occasions, defendant remarked, "That little liar told me she was coming back this weekend. This [*sic*] already been two weeks." Flenard was unaware of any intimate relationship defendant may have had with his sister. Linda Johnson returned from Long Beach on September 12, 1984, driving Cooper's blue Cadillac. After going to the hospital to see her ailing mother, she went home.

A fire broke out and destroyed the Johnson home around 5 a.m. on September 13th. Neither Linda Johnson nor the Cadillac was there. An arson expert determined that the fire was started by lighting a flammable liquid placed in three separate locations in the house. When Flenard went to defendant's house that morning, he noticed the tire tracks in the driveway were identical to those left by Cooper's blue Cadillac in Johnson's mother's driveway.

Later that day, police found the seminude body of Linda Johnson in a canal outside Fresno. Detective Martinez found two Budweiser beer cans about thirty-five feet from the body. An autopsy revealed the victim died from 18 separate blows to the head by a blunt instrument with a sharply angled edge. The blows caused numerous fractures and extensive hemorrhaging. Material taken from the victim's vagina tested positive for prostatic acid phosphatase, an enzyme found in semen. A black adhesive substance

found on the body was similar to weather stripping found in the trunk of Cooper's Cadillac.

About 10 o'clock that night, a passerby observed a blue Cadillac on fire. The smell of gasoline was apparent. An expert investigating the car fire concluded that it was Cooper's Cadillac and that a flammable liquid was used to intentionally ignite the blaze. Police found a matchbook cover marked "Royal Guest" near the burning car, and also found a beer can about 100 yards away.

Police interviewed defendant the next day. There was a scratch on his face that appeared to be between 12 and 48 hours old. Police found another matchbook marked "Royal Guest" on the floorboard of defendant's red Cadillac.

A.C. Harris told police that defendant described the crime in detail to him. According to Harris, defendant asked the victim to become a prostitute but she refused. Defendant then raped her and killed her by hitting her on the side of the head. He and a friend, Leonard Hutchinson, then placed the body in Cooper's Cadillac and dumped the body in an irrigation ditch. Returning to Johnson's house, defendant poured gasoline on it and started the fire to cover the evidence. When defendant came home shortly after the fire, he smelled like gasoline. Harris also stated defendant kept a sawed-off baseball bat, a knife, and a 30- to 36-inch piece of galvanized pipe in his car. Harris further said that when police came to arrest defendant, he told Harris, "I'm so nervous," and admitted he killed Linda Johnson and raped another woman.[1]

Police found another "Royal Guest" matchbook in Hutchinson's living room.

Melvin Cooper, the victim's boyfriend, testified that although he had a sexual relationship with the victim, they had not had relations in the three or four weeks prior to the victim's death.

Several witnesses testified to statements defendant made evidencing his intent to kill Linda Johnson. For example, Matt Miller said he saw defendant arguing with the victim two weeks before her death. After she left, defendant told Miller he was going to have sex with her "and then finish her, and dispose of her, done, over, no more." Later, he told Miller about a

---

[1] At trial, Harris claimed his entire statement was fabricated. He said he lied so the police would not arrest him or his mother. He claimed he believed the truth would be sorted out at trial. The tape-recorded statement was played for the jury as a prior inconsistent statement.

woman and said he had "caved her . . . head in," and she would not be troubling him anymore.

Albert Aranda testified that defendant told him that he was living with Flenard Johnson's younger sister and that "if she don't behave right, [I'm] gonna kill her like the rest of them." Two weeks later, Aranda heard Linda Johnson had been killed. Defendant frequently told Aranda that all prostitutes should be killed because they did not "treat him right."

Jessie Thomas testified that defendant told him that an attractive woman from Los Angeles lived next door to him, that he liked her, and that he would "get her one way or the other."

Two days after the killing, defendant sexually assaulted Janyce B., a prostitute. After the assault, he told her he killed the woman that lived next door to him in Selma. Later, he told her he was kidding.

Finally, after his arrest, defendant told his cellmate, Kenny Smith, that he had wanted to "make out" with his girlfriend, she refused, and he beat her until she was unconscious. He then claimed he burned down her house with gasoline, and drove a car to the country and burned it as well.

On the day of the murder, defendant's employer, Earl Wells, asked defendant and David Pulley to tear down an old garage, clear the brush, and burn the materials and debris. The two stopped at 10:30 that morning and filled a two-gallon can with gasoline for the job. Defendant saw the victim in Cooper's Cadillac and told Pulley, "Well, I'm gonna get that Cadillac one way or another, if it takes me to jail or imprisonment or killing her." After completing the demolition job, defendant told Pulley he was going to drink some beer, and "as soon as he got up enough courage that he was going to go over to whoever's house and burn the bitch out" with gasoline. Defendant drove off with the gasoline can still partially full.

### 2. Olga Cannon

Olga Cannon, also known as Wendy and Nene, worked as a prostitute on G Street in Fresno. She spoke often with defendant and he introduced her to various people as his girlfriend or his wife. In early August 1984, defendant complained to Flenard Johnson that Cannon charged him $35 for sexual relations but charged Mexicans only $15. He bragged that he would rape and rob Cannon, and then "put her out." On another occasion, he said he would "beat [her] brains out." Also around this time, defendant twice told Jessie Thomas that he wanted to kill Cannon.

Albert Aranda saw Cannon with defendant on August 14, 1984. Defendant told Aranda that if Cannon did not behave, he was going to kill her. He then sped off with Cannon in his van. Cannon's husband, Larry Shepard, reported her missing the next day.

Around this time, defendant was living with Louisia Thomas, a former prostitute who had worked on G Street and knew Olga Cannon. He told Louisia Thomas that Cannon had been killed by some Mexicans in a payment dispute. Later, he said he was only kidding. The next day, Louisia Thomas found a brown leatherette purse in defendant's car. She asked if she could have it but defendant took it away from her. Although he later gave it to her, he first removed some papers from it. The purse was later identified as belonging to Cannon.

Cannon's nude body was found on December 8, 1984, in an irrigation ditch outside Fresno. Because of advanced decomposition of the body, the cause of death could not be determined, although it was determined that she had a broken jaw. There was an empty Budweiser can three feet from the body.

As with the Linda Johnson killing, defendant also made incriminating statements about the Cannon killing to his cellmate, Kenny Smith. Defendant told Smith he picked up Cannon on G Street and demanded sex. She refused so he drove to the country and forced her to "make out" with him by slapping her. When she tried to get out of the car, he "went berserk" and beat her to death with a crowbar. He then "ditched her body."

3. *Jacqueline Frazier*

Jacqueline Frazier apparently worked as a prostitute in the Fresno area, often picking up men at Hunt's Club and bringing them home with her. Rodney Bradley, her former boyfriend, often watched her apartment and saw her come home with different men. On one occasion, Bradley saw her come home with defendant, who was a frequent customer at Hunt's Club.

It was Frazier's habit to wear eight rings, four on each ring finger. On July 21, 1984, she wore only seven, having misplaced one earlier in the day.

Later that evening, Frazier's brother saw her at Hunt's Club about 9:30 o'clock. At 11:30 or 12 that night, Eloisa Mayberry saw Frazier sitting in a Ford Pinto with defendant, parked in front of the club.

Frazier's body was discovered three days later in a canal. She was still wearing the clothes she wore three days earlier, but was missing three of her

seven rings. Police found a pair of women's panties, a broken Budweiser bottle, and an empty Budweiser carton in the vicinity. Tests revealed death was caused by drowning, although she had been beaten about the head and neck with a blunt instrument. An autopsy also revealed the presence of semen in her vagina. Tire tracks near the body were similar to tracks left by the Pinto defendant drove on July 21, although a positive match could not be made. Two of the missing rings were later found in defendant's jewelry box.

### 4. *Karen Robinson*

Karen Robinson worked as a prostitute on G Street. Her friend, Vonceil Whitehead, also knew defendant and had seen defendant with Robinson on several occasions. The last of these occasions was August 21, 1983, when Whitehead saw Robinson speaking to defendant as he sat in a Ford LTD. The next day, Ricky Glenn repaid a $5 debt to Robinson and watched her enter a similar car. She was wearing red shorts, a red blouse, and tennis shoes.

Her body was found the next day in a pond. The red blouse was around her ankles and the rest of her clothes were missing. There were some bloodstains near the body and an empty Budweiser carton between the bloodstains and the body. An autopsy revealed the victim had been beaten about the face and head, and then drowned. Tests showed the presence of semen in the vagina and anal canal. It appeared she had been dead for 12 to 24 hours.

In the course of their investigation, police gave defendant's photograph to Robinson's father, Lonnie Manning. Robinson's seven-year-old daughter, Temika, saw the photograph and said, "Papa, this is a mean man." Temika also recalled three violent episodes involving her mother and defendant. In all of them, defendant began fighting and choking Robinson. On more than one occasion, he threatened to kill her. Temika was "real scared" of defendant's photograph.

About a month prior to killing Linda Johnson, defendant told his half brother Harris that he had killed three prostitutes. He said that each time, he talked to them, got them into his car or van and, after having sex, he took their money. When they protested, he killed them by choking and beating them to death.

### 5. *Other Crimes*

Carren F. worked as a prostitute on G Street and "dated" defendant a few times. Sometime in August 1984, she spent the night with defendant in

exchange for $150. The next day, defendant accused her of stealing his money. She angrily denied the accusation and announced she would no longer "date" him because he scared her. A few days later, he asked her for a "date" and requested that she not tell anyone about it. She reluctantly agreed and he picked her up at 11 p.m. Defendant then drove to an isolated orchard, parked, placed some money on the dashboard, and got in the back seat with Carren F. He then asked why she had stolen his money and went to the trunk, returning with a pipe and a wine bottle. After hitting her once, he announced that the "date" was a ruse to get her out to the orchard and that he was going to kill her.

Carren F. managed to talk defendant out of killing her, submitting to sexual intercourse out of fear. She reported the incident the next day but declined to press charges. She called an anonymous tip line when she heard of Olga Cannon's murder; she believed defendant was Cannon's killer.

Lydia L. worked as a prostitute in the Chinatown area of Fresno. One night in the summer of 1983, she agreed to "date" defendant. Although she preferred to rent a room, defendant drove to an orchard in the country. She expressed a desire to finish the "date" and get back to town, whereupon defendant started strangling her. She apologized and he stopped and said, "I'm sorry I lost control." Lydia L. decided to do whatever defendant asked. They engaged in sexual intercourse and, later, afraid defendant would hurt her, she orally copulated him at his direction. She later bolted from his car and reported she had been raped.

Gayle H. worked as a prostitute on G Street. She agreed to "date" defendant but, once in his car, he attempted to rob her. When she laughed and said she had no money, he knocked her unconscious. When she awoke, she was in defendant's car, parked in the country. He pressed a screwdriver under her eyes and said that if she didn't comply with his demands, he would pop her eyes out so that she would be unable to identify him. He demanded oral sex but she could not comply because defendant had broken her jaw. The ordeal lasted 45 minutes with defendant constantly striking her in an attempt to have her orally copulate him. He eventually fled when a truck approached, allowing Gayle H. to escape.

Detective Rascon arrested defendant on September 15, 1984, for killing Linda Johnson. On the way to jail, Rascon's car passed G Street. As it did, Rascon overheard defendant mutter, "Good-bye, 'G' Street."

Defendant testified on his own behalf. He claimed he did not know and never had sexual relations with Gayle H., Jacqueline Frazier, or Karen Robinson. He denied knowing Robinson's daughter, Temika. He admitted

spending the night with Carren F. and claimed that she stole $200 from him and that he never engaged in any violence towards her. He admitted knowing Olga Cannon and said they never fought. He denied making incriminating statements to A.C. Harris, Kenny Smith, Flenard Johnson, Jessie Thomas, or Matt Miller. He denied killing Linda Johnson, Cannon, Frazier, or Robinson.

*Penalty Phase*

Several women testified at the penalty phase and offered evidence of defendant's prior criminal activity. Mary W. testified that she was in the eighth grade in 1962 when defendant lured her into his car on the pretext of driving her to school. Instead of driving to her school, however, he drove to a vineyard. Once there, he beat and forcibly raped her. Defendant later pleaded guilty to rape.

In 1961, Gladys P. was defendant's neighbor. One night that year, she was in defendant's house and he offered to walk her home. She accepted, but once outside, defendant put his hand over her mouth, picked her up and carried her to a toolshed, where he raped her. She did not report the crime because she was ashamed of it. Later that year, defendant came to her house and acted as if he were her boyfriend, accusing her of being with a married man. She retrieved a gun and announced she was going to kill him, but when her grandmother walked into the room, defendant knocked the gun away.

That fall, defendant forced Gladys P. into his car and drove to a barn where he beat and forcibly raped her. Afterwards, they got back into the car and drove to a store. Later, he raped her again. When the prosecuting attorney explained what would happen if she prosecuted, she declined to press charges and moved from Selma because everyone knew she had been raped. She did not tell her mother about being raped in the toolshed until she heard Linda Johnson had been killed. Johnson was Gladys P.'s cousin.

In the spring of 1966, Dale Drake and Mary Richardson drove to a beach on the Kings River, where they encountered defendant. Armed with a rifle, defendant grabbed Drake and demanded money. He also said he was on parole and that he had been forced to have sexual relations with his ex-wife. When he announced he could not allow them to leave, Richardson ran away. Looking back, she saw defendant strike Drake on the head with the rifle butt. Returning with police, they found Drake bleeding profusely from the head. Her bathing suit had been ripped, exposing her torso.

Defendant was traced through his truck's license number, which Richardson had noted before fleeing the scene. Drake suffered serious head

injuries and a broken wrist. Defendant later pleaded guilty to assault with a deadly weapon and attempted rape.

In 1977, defendant telephoned Chun Smith and asked her to meet him at the Greyhound bus depot. She declined but later agreed because of defendant's persistence. They sat in her car and conversed for a time until he said something that made her laugh. Suddenly, he hit her, told her to shut up, grabbed her neck, and knocked her unconscious. When she regained consciousness, the car was moving. She either jumped or was pushed from the car as it was travelling about 40 miles per hour. Her car was recovered two weeks later in Oakland.

Also in 1977, Betty Burrell began corresponding with defendant while he was still in prison. When he was released, he visited her in Oakland. Sometime after Burrell told defendant she wanted to end their relationship, he attacked her as she walked to her car. Although he held a butcher knife to her neck, she struggled with him. He eventually let her go when her sons confronted him with baseball bats. She later moved out of her apartment.

Sometime later, defendant forcibly entered the home of Burrell's neighbor, Rosemary Graham, and demanded that Graham's friend, Henry Jones, take him to Burrell. He threatened them with a shotgun. He said Burrell had wronged him and he was going to kill her. When Jones's car was later stopped on the freeway, defendant was pointing his gun at Jones. Burrell testified against defendant at a preliminary hearing but charges were dropped when, pursuant to a plea bargain, defendant pleaded guilty to assaulting Jones with a deadly weapon.

Evidence of defendant's sexual assault on Janyce B., the prostitute to whom defendant made incriminating statements about the Linda Johnson murder, was admitted without limitation at the penalty phase. Evidence of defendant's conviction of false imprisonment in connection with that incident was also admitted.

Defendant presented evidence of his good character in mitigation. Darrel Williams, his stepbrother, testified defendant helped neighbors work around their homes and also gave financial assistance to their mother. He recalled defendant was a good athlete in high school.

Earl Wells, defendant's employer, had known defendant since he was in high school and believed defendant was a good and reliable worker. Imogene Wells, Earl's wife, echoed her husband's sentiments.

Artis Williams, defendant's mother, testified that defendant was born in 1940 in Shreveport, Louisiana. She separated from her husband four years

later and moved to California, leaving defendant and his three siblings with her parents in Shreveport. The family reunited in 1948, when Williams was living in Los Angeles. The family moved to Selma in 1950. It was there defendant attended and graduated from high school. She was not aware of any of her neighbors having a problem with defendant. To her knowledge, defendant never had any trouble while incarcerated, and noted he was made a trusty while in Fresno County jail.

## DISCUSSION

### Guilt Phase Issues

#### 1. Sufficiency of the Information

Counts 14 to 24 of the information charged defendant with committing various felonies against six different victims.[2] The information for these counts was phrased in the traditional "on or about" language, i.e., "on or about the summer of 1983," or "on or about April of 1983." ▮ Defendant claims his due process rights were violated as to these 11 counts because the information failed to specify a particular date on which the crimes allegedly occurred, thereby preventing him from presenting an alibi defense. At the outset, however, we note defendant was not convicted of the crimes set forth in counts 14, 15, and 20 to 22 (Rhonda S., Sharon H., Dorothy T.), and so any deficiency in the pleadings was therefore moot as to those counts.

As to the remaining counts, defendant concedes he did not demur to the information. Under these circumstances, the claimed defect in the information was waived. (*People v. Jackson* (1978) 88 Cal.App.3d 490, 500 [151 Cal.Rptr. 688]; § 1012 [failure to demur to a demurrable defect apparent on the face of a pleading waives the defect].) ▮ " 'Any uncertainty in the pleading amounts to no more than a defect of form, which should be attacked under Penal Code section 1004. Failure to demur to an information on the ground of uncertainty constitutes a waiver of the objection . . . , and the validity of the subsequent objection is not affected.' " (*Jackson, supra,* at p. 500, quoting *People v. Washington* (1971) 17 Cal.App.3d 470, 475 [94 Cal.Rptr. 882], disapproved on other grounds in *People v. Najera* (1972) 8 Cal.3d 504, 509, fn. 4 [105 Cal.Rptr. 345, 503 P.2d 1353].)

---

[2] The challenged counts include: forcible rape of Rhonda S. (No. 14); forcible oral copulation of Rhonda S. (No. 15); forcible rape of Carren F. (No. 16); kidnapping of Carren F. (No. 17); forcible rape of Lydia L. (No. 18); forcible oral copulation of Lydia L. (No. 19); forcible rape of Sharon H. with a deadly weapon (No. 20); forcible oral copulation of Sharon H. (No. 21); forcible oral copulation of Dorothy T. with great bodily injury (No. 22); kidnapping for robbery of Gayle H. with weapon use and great bodily injury (No. 23); and forcible oral copulation of Gayle H. with great bodily injury (No. 24).

The purpose of the waiver rule is twofold. First, it permits correction of pleading defects prior to trial, thereby promoting efficiency and conserving judicial resources. Second, it prevents "[a] defendant from speculating on the result of the trial and raising the objection after an unfavorable verdict." (4 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Proceedings Before Trial, § 2132, p. 2502.) This rule is of long standing; we stated 90 years ago that a criminal defendant "cannot, under our system, lie by until he shall see the result of a trial of his case on the merits and then be permitted to take advantage of a mere uncertainty in the indictment by motion in arrest of judgment." (*People* v. *Rodley* (1900) 131 Cal. 240, 249 [63 P. 351].)

■ Defendant posits two theories why his failure to demur did not waive the issue for appeal. First, he relies on *People* v. *Frank* (1985) 38 Cal.3d 711 [214 Cal.Rptr. 801, 700 P.2d 415], for the proposition that in capital cases, "a technical insufficiency in the form of an objection will be disregarded and the entire record will be examined to determine if a miscarriage of justice resulted." (*Id.* at p. 729, fn. 3.) However, the complete failure to demur in this case is not analogous to the "technically insufficient" objection in *Frank*. (See *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1129-1130, fn. 3 [240 Cal.Rptr. 585, 742 P.2d 1306] [failure to "even allude" to Evid. Code, § 352 is distinguishable from the "technical insufficiency" in *Frank*].)

Second, defendant claims his trial counsel provided constitutionally ineffective assistance by failing to demur. (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 215-218 [233 Cal.Rptr. 404, 729 P.2d 839]; *People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]; U.S. Const., Amend. VI; Cal. Const., art. I, § 15.) ■ In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693-694, 104 S.Ct. 2052]; *Ledesma, supra,* 43 Cal.3d at pp. 215-216.) Second, he must also show prejudice flowing from counsel's performance or lack thereof. (*Strickland, supra,* at pp. 691-692 [80 L.Ed.2d at pp. 695-696]; *Ledesma, supra,* at pp. 217-218.) Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*In re Sixto* (1989) 48 Cal.3d 1247, 1257 [259 Cal.Rptr. 491, 774 P.2d 164]; *Strickland, supra,* at p. 694 [80 L.Ed.2d at pp. 697-698].) ■ As we explain, however, counsel was not remiss because it does not appear a demurrer would have been granted had he timely filed one.

█ We begin our analysis with section 955, which provides, "The precise time at which the offense was committed need not be stated in the accusatory pleading, but it may be alleged to have been committed at any time before the finding or filing thereof, except where time is a material ingredient in the offense." (See also *People* v. *Wrigley* (1968) 69 Cal.2d 149, 155 [70 Cal.Rptr. 116, 443 P.2d 580] [following § 955]; § 951 [form of information approving the "on or about" phraseology].) In accordance with this statutory directive, we recently noted that a "defendant has no right to notice of the specific time or place of an offense, so long as it occurred within the applicable limitation period. 'Beyond that, . . . the prosecution clearly has no duty to provide more explicit notice than human nature or science permit.'" (*People* v. *Jones* (1990) 51 Cal.3d 34, 56 [270 Cal.Rptr. 611, 792 P.2d 643], quoting in part *People* v. *Gordon* (1985) 165 Cal.App.3d 839, 868 [212 Cal.Rptr. 174] [conc. opn. of Sims, J.].) Under modern pleading procedures, notice of the particular circumstances of an alleged crime is provided by the evidence presented to the committing magistrate at the preliminary examination, not by a factually detailed information. (*People* v. *Thomas* (1987) 43 Cal.3d 818, 829 [239 Cal.Rptr. 307, 740 P.2d 419].)

█ Defendant contends *People* v. *Barney* (1983) 143 Cal.App.3d 490 [192 Cal.Rptr. 172] establishes a due process right to an information that more explicitly sets forth the date of the offense. In *Barney*, the information charged the defendant with having committed a lewd act with a minor "on or about" February 8, 1981. Barney presented a defense of lack of opportunity, a defense the Court of Appeal termed "analogous" to a classic alibi defense. (*Id.* at p. 498.) Although the prosecution's evidence at trial fixed the time of the alleged crime on a certain date, the trial court instructed the jury that it was not necessary that the proof show the crime was committed on that date. Instead, the trial court said it was permissible to convict if the jury concluded the crime was committed "on or about" that date.

The appellate court reversed. After first acknowledging that the People do not have to plead the exact date of the offense, the court stated, "if the defense is alibi or, as here, lack of opportunity to commit the offense, the exact time of commission becomes critically relevant to the maintenance of the defense. *An instruction* which deflects the jury's attention from temporal detail may unconstitutionally impede the defense. The defendant is entitled as a matter of due process to have the time of commission of the offense fixed in order to demonstrate he was elsewhere or otherwise disenabled from its commission." (*Barney, supra,* 143 Cal.App.3d at p. 497, italics added.)

As is clear, the *Barney* court did not hold that *the information* must plead the exact date of the offense. Instead, it merely held that when the prosecu-

tion's proof establishes the offense occurred on a particular day to the exclusion of other dates, and when the defense is alibi (or lack of opportunity), it is improper to give the jury an instruction using the "on or about" language. (143 Cal.App.3d at p. 497.) This holding is unremarkable, being consistent with past authority. (See *People* v. *Jones* (1973) 9 Cal.3d 546, 557 [108 Cal.Rptr. 345, 510 P.2d 705], overruled on other grounds in *Hernandez* v. *Superior Court* (1989) 49 Cal.3d 713 [263 Cal.Rptr. 513, 781 P.2d 547]; Com. to CALJIC No. 4.71 (5th ed. 1988 bound vol.).) Because *Barney* did not address the constitutionality of charging a criminal defendant in a pleading that does not specify the precise day of the crime, it provides no support for defendant's claim that his right to due process was abridged.

It thus appears that even had counsel demurred to the information, the demurrer would have been overruled. Under these circumstances, no ineffective assistance of counsel is apparent and defendant is not relieved of the requirement of demurring to the information in order to preserve the issue for appeal. We conclude he waived the issue.

### 2. *Change of Venue*

Prior to trial, defendant moved for a change of venue. Dr. Holder, a defense expert, filed a report concluding (1) 72 percent of persons surveyed recalled the case, a number he termed "a rather strong percentage of recollection of the case"; (2) only about one-fourth of those contacted recalled any *details* about the case; (3) 51 percent of those surveyed "thought they might be influenced by the publicity"; (4) an unusually small percentage (31 percent) believed the district attorney had a very strong case against defendant; and (5) 64 percent believed the jury could be impartial in Fresno County. Of the 423 persons assembled for voir dire, 269, or 64 percent, stated they had been exposed to some media coverage about the case. The trial court did not hold a formal hearing on the venue motion; the matter was instead submitted on the briefs and Dr. Holder's report. Defendant attached six newspaper articles from the Fresno Bee to his motion and these articles were considered by the trial court. The court denied the motion without prejudice; defendant did not renew the motion.

■ Defendant contends the trial court erred by denying his change of venue motion. The applicable principles are well established. ■ " 'A change of venue must be granted when the defendant shows a reasonable likelihood that in the absence of such relief, a fair trial cannot be had.' " (*People* v. *Williams* (1989) 48 Cal.3d 1112, 1125 [259 Cal.Rptr. 473, 774 P.2d 146], quoting *People* v. *Harris* (1981) 28 Cal.3d 935, 948 [171 Cal.Rptr. 679, 623 P.2d 240].) When the denial of a motion for a change of

venue is reviewed on appeal, we make an independent determination of whether a fair trial was obtainable. (*Williams, supra*, at p. 1125; *People* v. *Balderas* (1985) 41 Cal.3d 144, 177 [222 Cal.Rptr. 184, 711 P.2d 480].) In making that decision, we examine five factors: the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim. (*People* v. *Douglas* (1990) 50 Cal.3d 468, 495 [268 Cal.Rptr. 126, 788 P.2d 640]; *Williams, supra*, at p. 1125; *Balderas, supra*, at p. 177.)

In contrast to pretrial appellate review by way of a petition for a writ of mandate, review on appeal is retrospective. Thus, "any presumption in favor of a venue change is unnecessary, for the matter may then be analyzed in light of the voir dire of the actual, available jury pool and the actual jury panel selected. The question then is whether, in light of the failure to change venue, it is reasonably likely that the defendant in fact received a fair trial." (*Williams, supra*, 48 Cal.3d at pp. 1125-1126.) To answer this question, we examine "the voir dire of prospective and actual jurors to determine whether pretrial publicity did in fact have a prejudicial effect." (*Balderas, supra*, 41 Cal.3d at p. 177.)

We begin with the gravity and nature of the crime. Of course, capital murder is the most serious crime and "that fact weighs strongly in favor of a change of venue." (*Balderas, supra*, 41 Cal.3d at p. 177.) Indeed, the prosecuting attorney admitted as much at trial. Although this factor is not, by itself, dispositive (see *Odle* v. *Superior Court* (1982) 32 Cal.3d 932, 942 [187 Cal.Rptr. 455, 654 P.2d 225]), we reiterate that the fact that an accused is facing the death penalty is a factor militating strongly in favor of a change of venue.

Moreover, the nature of the crime also supports a change. Defendant was charged with four murders and thirteen counts of forcible sex crimes, as well as other assorted felonies and weapon enhancements. The victims were all women and, with the lone exception of Linda Johnson, were all prostitutes working in the Fresno area. The murder victims were found nude or partially undressed in irrigation canals in semirural areas of the city. At least one victim had been under water so long that her body was badly decomposed. Under the circumstances, the public understandably believed there was a serial killer in their community. As in *Harris, supra*, 28 Cal.3d at page 948, we conclude these crimes "were especially heinous" and that the nature of the crimes is another factor supporting a change of venue.

Analysis of the nature and extent of the pretrial publicity is a more complex matter. Although defendant strenuously argues that the pretrial

publicity was pervasive and inflammatory, the evidence produced at trial consisted of a mere six newspaper articles from the Fresno Bee. Moreover, as the trial court recognized, 11 months had passed between publication of the last article and the commencement of jury selection. (See *Anderson*, *supra*, 43 Cal.3d at p. 1130 [danger of prejudice significantly reduced where last article published five months before commencement of jury selection].) "Time dims all memory and its passage serves to attenuate the likelihood that early extensive publicity will have any significant impact at the time of trial." (*Odle* v. *Superior Court, supra*, 32 Cal.3d 932, 943.)

Defendant argues that any assumption the prejudicial effect of the publicity was blunted by the passage of time is rebutted by his evidence showing more than 70 percent of the community recalled hearing something about the case. Dr. Holder's report, however, concluded that although a high percentage of persons recalled something about the case, many fewer could recall anything specific, and approximately two-thirds of those polled believed a Fresno County jury could be impartial. This prediction was borne out by the actual voir dire, when the 12 jurors who ultimately sat on defendant's case stated they either had no recollection of the case or admitted having some vague memory based on the prior publicity but could not recall anything specific about the case.

Because defendant was implicated by the media in so many serious crimes, he argues the jurors' collective profession of ignorance of the case should be viewed with skepticism. Although we agree that such assurances are not conclusive (*People* v. *Tidwell* (1970) 3 Cal.3d 62, 73 [89 Cal.Rptr. 44, 473 P.2d 748]), several factors present here convince us they were sincere. First, as noted above, the publicity had abated by the time of trial; the last article supporting the venue motion was published 11 months before jury selection. Second, as the trial court held, the publicity was not extensive. Finally, and most significantly, Dr. Holder's expert opinion was that despite the high penetration of information into the public mind, an impartial jury could be chosen, apparently because the publicity did not have a lasting or pervasive effect. We thus accept the jurors' representations of impartiality as one factor supporting the trial court's decision to deny the venue motion.

Defendant also relies heavily on the allegedly inflammatory nature of the publicity. He asserts the articles reported that (1) Janyce B. stated defendant admitted one of the murders to her, (2) defendant was suspected in a fifth, uncharged murder, (3) he had spent 18 of the previous 22 years in prison, and (4) various incriminating evidence had been discovered in

defendant's residence, such as the jewelry and underwear of some of the victims.[3]

The reporting of these facts is troublesome. Although the reports were largely factual, they nevertheless could have led to a jury pool disposed to convict. Moreover, the fact that the publicity was factual and not inflammatory or sensational is not controlling. ■ " 'A reasonable likelihood of unfairness may exist even though the news coverage was neither inflammatory nor productive of overt hostility. [Citation.] When a spectacular crime has aroused community attention and a suspect has been arrested, the possibility of an unfair trial may originate in widespread publicity describing facts, statements and circumstances which tend to create a belief in his guilt.' " (*Martinez* v. *Superior Court* (1981) 29 Cal.3d 574, 580 [174 Cal.Rptr. 701, 629 P.2d 502], quoting *Corona* v. *Superior Court* (1972) 24 Cal.App.3d 872, 877 [101 Cal.Rptr. 411].)

The contrary may also be true, depending on the particular facts of the case. "The fact that a case receives enormous publicity does not by itself establish error nor does conceded 'massive' publicity automatically translate into prejudice." (*People* v. *Manson* (1976) 61 Cal.App.3d 102, 191 [132 Cal.Rptr. 265].) In *Odle* v. *Superior Court, supra,* 32 Cal.3d 932, for example, over 150 newspaper articles reported on the crime, including several which "contained information that might be potentially prejudicial." (*Id.* at p. 939.) We nevertheless declined to issue a writ to reverse the trial court's denial of a change of venue, explaining that although there were an inordinate number of newspaper articles about the case, "they received very limited circulation, and the reporting on the whole was not inflammatory, sensational, or hostile." (*Ibid.*)

■ Considering the totality of the circumstances in this case, we conclude the evidence of media coverage does not demonstrate a reasonable likelihood of unfairness, or that the publicity led to the selection of a jury that was tainted by prejudicial pretrial information. Indeed, the record demonstrates the contrary: there were relatively few newspaper articles, they were remote in time from the trial, and they had no lasting effect on those summoned for jury duty. Moreover, expert evidence disclosed that obtaining a fair jury was possible despite the pretrial publicity.

We conclude that consideration of the nature and extent of the publicity supports the trial court's decision to deny defendant's motion to change venue.

---

[3] Although a few of these facts have been confirmed from the photocopies of the six articles in the record, the copies are almost illegible, with large portions of the articles unreadable. Counsel has promised to provide more legible copies in connection with a petition for a writ of habeas corpus he intends to file in the near future.

■ The third factor is the size of the community. "The larger the local population, the more likely it is that preconceptions about the case have not become imbedded in the public consciousness." (*Balderas, supra,* 41 Cal.3d at p. 178.) The size of the county is not alone determinative. (*Fain* v. *Superior Court* (1970) 2 Cal.3d 46, 52, fn. 1 [84 Cal.Rptr. 135, 465 P.2d 23].) The key is whether it can be shown that the population is of such a size that it "neutralizes or dilutes the impact of adverse publicity." (*Lansdown* v. *Superior Court* (1970) 10 Cal.App.3d 604, 609 [89 Cal.Rptr. 154].)

■ Defendant's trial took place in 1986. Fresno County then had a population of 580,200, ranking it the 12th most populous county. (State of Cal., Cal. Statistical Abstract (1986) p. 16.) We have previously noted that Fresno County is "considerably more populous and . . . less provincial" than other counties from which we concluded a change of venue was necessary. (*People* v. *Hathcock* (1973) 8 Cal.3d 599, 620 [105 Cal.Rptr. 540, 504 P.2d 476].) Moreover, Dr. Holder's report reveals the relatively large population of the county acted to dilute the impact of the adverse publicity; although he found many citizens recalled the case, many fewer could recall anything specific. We conclude this factor did not weigh in favor of a change of venue.

The final two factors, the status and prominence of the defendant and the victims, also do not support a change. Although defendant grew up in Selma and was a resident of the community, he had also spent much of his adult life in prison. The victims, save one, were prostitutes. Although they could be seen as especially vulnerable, they do not occupy an elevated position in society. Neither defendant nor the victims were prominent or well known in the Fresno area. We conclude neither factor supported a change of venue.

Considering the totality of the evidence, we conclude defendant has not shown it was reasonably likely he could not receive a fair trial in Fresno County absent a change of venue. Although the gravity and nature of the crime supported a change, the remaining four factors did not. Significantly, the voir dire of the actual jurors demonstrated that none was tainted by the modest pretrial publicity. We conclude the trial court correctly denied the venue motion.

### 3. *The Corpus Delicti Rule and Insufficient Evidence*

Defendant challenges several of his convictions on the dual grounds that admission of his extrajudicial statements violated the corpus delicti rule and that there was insufficient evidence to convict. As we explain below, these contentions are meritless.

■ The corpus delicti rule requires that the corpus delicti of a crime be proved independently from an accused's extrajudicial admissions. (*People* v. *Robbins* (1988) 45 Cal.3d 867, 885 [248 Cal.Rptr. 172, 755 P.2d 355]; *People* v. *Alcala* (1984) 36 Cal.3d 604, 624 [205 Cal.Rptr. 775, 685 P.2d 1126].) "The corpus delicti of a crime consists of two elements, the fact of the injury or loss or harm, and the existence of a criminal agency as its cause." (*People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1175 [259 Cal.Rptr. 701, 774 P.2d 730].) Such proof, however, may be circumstantial and need only be a slight or prima facie showing "permitting the reasonable inference that a crime was committed." (*Alcala, supra,* at pp. 624-625.)

■ "When the sufficiency of the evidence is challenged on appeal, the court must review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence—i.e., evidence that is credible and of solid value—from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt." (*People* v. *Green* (1980) 27 Cal.3d 1, 55 [164 Cal.Rptr. 1, 609 P.2d 468]; see also *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

a. *Robbery of Linda Johnson*

■ We conclude that the corpus delicti rule was satisfied with respect to the Linda Johnson robbery. The blue Cadillac Johnson was driving was missing from her home. It was later found, on fire, some distance from the spot where police found Johnson's body. This evidence is sufficient to establish a prima facie showing that personal property was taken from the victim, thereby indicating the loss or harm. Moreover, because the victim was found beaten to death and her body abandoned in a rural area, we may infer the car was forcibly taken against her will, thereby establishing the action of a criminal agency. Although defendant contends there was no evidence of mental state, we may infer from the circumstances that the perpetrator intended to permanently deprive Johnson of the car. We conclude the corpus delicti for the robbery was established by evidence independent from defendant's numerous extrajudicial statements; for that reason, we need not address defendant's contention that his trial counsel was ineffective for failing to object on corpus delicti grounds to his admissions and confession. (See *People* v. *Moreno* (1987) 188 Cal.App.3d 1179 [233 Cal.Rptr. 863] [failure to object on corpus delicti grounds constituted ineffective assistance of counsel].)[4]

---

[4] We note, however, that the trial court instructed the jury pursuant to CALJIC No. 2.72, requiring it to find some proof of the crime independent of defendant's confessions or admissions. (See *People* v. *Howk* (1961) 56 Cal.2d 687, 706-707 [16 Cal.Rptr. 370, 365 P.2d 426] [instruction must be given sua sponte].)

 Defendant also claims there was insufficient evidence to show that he robbed Linda Johnson. This claim need not detain us long. Experts determined Johnson had been severely beaten, indicating the use of force. Melvin Cooper's blue Cadillac, last seen in her possession, was missing. Defendant admitted several critical, inculpatory details of the crime to Matt Miller, Albert Aranda, and David Pulley, among others. He confessed his guilt to A.C. Harris. It is manifest there is substantial evidence that defendant robbed Johnson of the Cadillac.

Defendant claims his various admissions go to the killing and not the robbery. Further, he argues there was no evidence showing he formed the intent to rob before he killed the victim. (*Green, supra*, 27 Cal.3d at p. 54; see also *People* v. *Ramkeesoon* (1985) 39 Cal.3d 346, 351 [216 Cal.Rptr. 455, 702 P.2d 613].) These assertions, however, ignore his admissions to Pulley. The day of Linda Johnson's disappearance and probable murder, defendant told Pulley that he intended to obtain Johnson's Cadillac "one way or another, if it takes me to jail or imprisonment or killing her." This evidence was sufficient to establish that defendant intended to rob Johnson prior to killing her.

b. *Robbery of Olga Cannon*

The evidence shows that the nude body of Olga Cannon was found in an irrigation canal. Although the cause of death could not be determined because of the advanced state of decomposition, the coroner determined that she had a fractured jaw. She was last seen the night of August 14, 1984, with defendant. A few days later, Louisia Thomas found Cannon's purse in defendant's car. When Louisia Thomas asked whether she could have the purse, defendant behaved in a suspicious manner. From this evidence, the jury could have reasonably concluded defendant had knowledge of crimes against Cannon.

These facts satisfy the corpus delicti rule as to the Cannon robbery. The missing purse provided evidence of the loss or harm. The condition of the body, coupled with defendant's suspicious behavior when Louisia Thomas discovered the purse, establishes a prima facie showing of the existence of a criminal agency. We may further infer from this evidence that the purse was taken from the victim by force or fear with the intent to permanently deprive her of it.

Defendant also contends that even assuming the corpus delicti rule is satisfied, there nevertheless was insufficient evidence of robbery. We disagree. About *one month before Linda Johnson's death*, defendant confessed

to his half brother, A.C. Harris, that he had killed three prostitutes.[5] In explaining his actions, defendant told Harris that he would "proposition the money, take them out, *take their money* back from them after he [got] through doing what he wants" and then kill them when they struggled or cried rape. (Italics added.)[6]

Around the same time Cannon disappeared, defendant asked Flenard Johnson whether he remembered Cannon. Defendant then proclaimed, "Man, I took her ass out the other night. I got her loaded and fucked her three times, *took her money*, put her ass out." (Italics added.) A few days later, he told Flenard Johnson "practically" the same thing.

Defendant attempts to explain his admissions to Flenard Johnson by claiming that he was boasting of having taken money on *some prior occasion* and not on the critical night when Cannon was killed. While that inference is possible, it is certainly not the only one permissible on this record. (See *People* v. *Ramirez* (1979) 91 Cal.App.3d 132, 137 [153 Cal.Rptr. 789].) We conclude the evidence of defendant's admissions, his unexplained possession of Cannon's purse shortly after she disappeared, his suspicious behavior regarding the purse with Louisia Thomas, and the evidence of obvious force applied to Cannon's body, viewed in a light most favorable to the judgment below, constitutes substantial evidence from which a rational trier of fact could have found defendant robbed Cannon of her purse before killing her. (*Johnson, supra,* 26 Cal.3d at p. 578.)

c. *Rape of Olga Cannon*

 Defendant forcefully argues that there was insufficient evidence to establish the corpus delicti of rape. In their respondent's brief, the People concede that the evidence supporting the corpus delicti of rape was "thin"

---

[5] Johnson's body was found on September 13, 1984. Cannon was last seen on August 14, 1984, by Albert Aranda.

[6] In his statement to police, A.C. Harris made the following comments:

"Q: Did he tell you they were prostitutes, the ones he killed?

"A: Uh, yeah, yeah.

"Q: Did he tell you anything how he, how he would do the women, how he would do the whores?

"A: Yeah, uh, uh, you know, talk to them first, you know, they get, they get in his car, then the van, proposition the money, take them out, take their money back from them after he get through doing what he wants, see, and what not. The woman gets mad, so they start fighting, so that way 'cause likely she goin holler rape on me, he know this, and so that's why he put, that's why he put them to sleep, Wilbur Jennings.

"Q: Did he put them to sleep?

"A: Yeah, yeah.

"Q: How did he tell you?

"A: You know, beat 'em up, beat 'em up, choke 'em."

but urge that the physical evidence, taken in conjunction with evidence of defendant's other crimes, comprises a prima facie showing that a rape occurred. At oral argument, however, the People retreated from that position, instead arguing that even without the evidence of defendant's other criminal acts, a prima facie showing of rape existed. As we explain, we need not decide the admissibility of other-crimes evidence to establish the corpus delicti because the physical evidence, and reasonable inferences drawn therefrom, satisfy the corpus delicti rule.

The evidence shows that the victim, Olga Cannon, was found, unclothed, in an irrigation canal. She had been dead several weeks. Although her body was badly decomposed, experts determined she had suffered a broken jaw. While this evidence would satisfy the corpus delicti of murder (there being evidence that she died through the involvement of a criminal agency), the evidence of rape was not strong. For example, because of the advanced state of decay, there was no evidence of seminal fluids on the body (see *People* v. *Wright* (1990) 52 Cal.3d 367, 405 [70 Cal.Rptr. 116, 443 P.2d 580] [corpus delicti proven from the condition of the body and presence of semen on the victim's external genitalia]; *People* v. *Morales* (1989) 48 Cal.3d 527, 553 [257 Cal.Rptr. 64, 770 P.2d 244] [evidence showed presence of spermatozoa]), or evidence of penetration (see *People* v. *Mattson* (1990) 50 Cal.3d 826, 874-875 [268 Cal.Rptr. 802, 789 P.2d 983] [victim found with a lacerated hymen]; *People* v. *Duncan* (1959) 51 Cal.2d 523, 528 [334 P.2d 858] [injuries to genitalia supported an inference of rape]). Further, there was no evidence that the victim's clothes were arranged in such a manner as to suggest a sexual assault. (See *Wright, supra,* at p. 383 [victim naked from the waist down].)

Although the evidence of rape is thus minimal, we nevertheless deem it sufficient to satisfy the corpus delicti rule. When the body of a young woman is found unclothed in a remote locale, an inference arises that some sexual activity occurred, thus satisfying the requirement that there be some showing of a loss, injury, or harm. *People* v. *Robbins, supra,* 45 Cal.3d 867, is illustrative. In that case, we listed the absence of any clothes where the body was discovered as one factor in proving the corpus delicti of lewd conduct with a child. (*Id.* at p. 886.) This was so despite the fact that the victim's body was so decomposed that a physical examination could not establish the commission of a sexual assault.

While the inference of sexual activity is by no means the only, or even the most compelling, one in this case (see, e.g., *Green, supra,* 27 Cal.3d at pp. 58, 61 [murder victim's clothes taken to conceal her identity]), it nevertheless remains a *reasonable* one, at least for corpus delicti purposes. Further, it is important that the victim was found in a location where her lack of

clothing was not easily explainable, that she was dead, and that she had suffered a broken jaw. From these factors, we may infer that whatever sexual activity occurred, it occurred against the victim's will. The evidence thus satisfies the second prong of the corpus delicti rule, i.e., the involvement of a criminal agency.

We reemphasize that the quantum of evidence the People must produce in order to satisfy the corpus delicti rule is quite modest; case law describes it as a "slight or prima facie" showing. (*Wright, supra,* 52 Cal.3d at p. 404; see 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, § 140, p. 156, and cases cited.) This minimal standard is better understood when we consider that the purpose of the corpus delicti rule is "to protect the defendant against the possibility of fabricated testimony which might wrongfully establish the crime and the perpetrator." (*People* v. *Cullen* (1951) 37 Cal.2d 614, 625 [234 P.2d 1].) As one court explained, "Today's judicial retention of the rule reflects the continued fear that confessions may be the result of either improper police activity or the mental instability of the accused, and the recognition that juries are likely to accept confessions uncritically." (*Jones* v. *Superior Court* (1979) 96 Cal.App.3d 390, 397 [157 Cal.Rptr. 809].)

Viewed with this in mind, the low threshold that must be met before a defendant's own statements can be admitted against him makes sense; so long as there is some indication that the charged crime actually happened, we are satisfied that the accused is not admitting to a crime that never occurred. Indeed, although proof of Cannon's murder does not necessarily tend to show a rape was committed, the independent evidence of Cannon's murder enhances the reliability of defendant's admissions to Kenny Smith that he forced Cannon to "make out" with him by slapping her. (See *Robbins, supra,* 45 Cal.3d at p. 886 ["the physical evidence of the homicide lends reliability to other aspects of defendant's confession"].)

Finally, we are convinced that it is fair in this case to apply the "slight or prima facie" standard for purposes of the corpus delicti rule. To hold otherwise would lead to the incongruous result of permitting a criminal to publicly proclaim his guilt so long as he was able to successfully hide the body of the victim. As this court opined in *Cullen, supra,* 37 Cal.2d at p. 624, "to require direct and positive proof of the corpus delicti would be most unreasonable; . . . the worst crimes are naturally committed at chosen times, in darkness and secrecy . . . . [H]uman tribunals must act upon such indications as the circumstances admit; . . . more often than not the attendant and surrounding facts remove all mystery and supply that degree of certainty men are daily accustomed to regard as sufficient in the most important concerns of life." As another court noted, successful disposal of

the victim's body "is one form of success for which society has no reward." (*People* v. *Manson* (1977) 71 Cal.App.3d 1, 42 [132 Cal.Rptr. 265].)

In sum, we find that although the evidence of Cannon's rape was "thin," it was sufficient to satisfy the corpus delicti rule. Because we reach this conclusion, we need not address the People's further contention that evidence of defendant's other crimes can be used to establish the corpus delicti of rape. Finally, defendant was observed in Cannon's company shortly before she disappeared. Then, around the time Cannon disappeared, defendant intimated to Flenard Johnson that he raped and killed her. (See, *ante*, p. 366.) Defendant also made incriminating admissions to his cellmate, Kenny Smith. We thus reject defendant's claim that there was insufficient evidence of convict him of raping Cannon.

d. *Murder of Jacqueline Frazier*[7]

 The evidence shows that on July 21, 1984, Frazier was seen wearing a green and white horizontally striped blouse. In addition, she was wearing seven of her customary eight rings. Frazier's brother, Freeman Burton, saw her that night at Hunt's Club. About 11:30 or 12 midnight, her friend Eloisa Mayberry saw her sitting in a Ford Pinto with defendant. At that time, Frazier told Mayberry that she would return to the club shortly. Frazier, however, never returned.

Her body was found two days later in an irrigation ditch. Three of her seven rings were missing. Most of her clothes were missing, but she was still wearing the green and white blouse. It was determined that she had been dead at least 36 hours and that there was semen in her vagina. Tire tracks found near the body were similar to those left by defendant's Pinto, although a definite identification could not be made because the tires on that car had no unique feature. Two of the missing rings were found in defendant's jewelry box in his home.

Significantly, about a month prior to the Linda Johnson killing (i.e., approximately mid-August 1984), defendant told A.C. Harris that he had killed three prostitutes. He admitted that for each one, he enticed them into his car or van, drove to rural areas, had sex with them, and then took his money back. When they protested, he beat and choked them to death. (See discussion, *ante*, p. 366, fn. 6.) Frazier was killed in late July 1984.

Keeping in mind that we "must review the whole record in the light most favorable to the judgment to determine whether it contains substantial

---

[7] Defendant does not raise a corpus delicti challenge to his convictions for murdering, robbing, and assaulting Frazier.

evidence . . . from which a rational trier of fact could have found the defendant guilty beyond a reasonable doubt" (*Green, supra,* 27 Cal.3d at p. 55), it is apparent that this web of circumstantial evidence is sufficient to support a conviction for murder. (See *People* v. *Reilly* (1970) 3 Cal.3d 421, 424 [90 Cal.Rptr. 417, 475 P.2d 649] [People may rely on circumstantial evidence to prove crime beyond a reasonable doubt].) Defendant was apparently the last person with the deceased before she died and tire tracks similar to those left by his car were found near the body. More important, he was in possession of two of the missing rings. Finally, he made suspicious and incriminating statements to Harris.

Defendant strenuously objects to the use of his admissions to Harris, claiming there was no evidence Frazier was a prostitute, thereby undercutting the relevance of his statements. Defendant notes that two *prosecution* witnesses, who were close enough to Frazier to know about her fondness for her rings, testified that to their knowledge, Frazier was not a prostitute. As the People assert, however, there was sufficient evidence provided by other witnesses from which a reasonable trier of fact could have concluded Frazier was engaging in prostitution during the period leading up to her death.

The main witness providing this information was Donna Bradley, one of Frazier's friends. Bradley testified that most of the times she visited Frazier's apartment, Frazier asked her to leave for a period of time because she was expecting company. Bradley testified the visitor was always male and almost always a different man. As she left the apartment on these occasions, Frazier usually said she was "going to try to get some money" from her male visitor. Bradley would return in one or two hours and the male visitor was always gone.

Rodney Bradley also testified. He recounted his experience watching Frazier's apartment and seeing her come home with different men. Finally, the People proved that Frazier did not work and received no financial assistance from her mother or former boyfriend. Thus, although there was no direct evidence Frazier was a prostitute, there is evidence from which a reasonable trier of fact could have so deduced. We conclude that defendant's statements to Harris were properly considered by the jury and that there was substantial evidence supporting the jury's verdict that defendant murdered Frazier.

e. *Robbery of Jacqueline Frazier*

■ As the evidence recounted above clearly shows, there was substantial evidence defendant robbed Frazier before killing her. Especially pertinent is the evidence that two of the victim's missing rings were found in

defendant's jewelry box and that defendant admitted to Harris that in addition to killing three prostitutes, he took their money.

As with his robbery of Linda Johnson, defendant claims there was no evidence showing he formed the intent to rob *before* he killed Frazier. (*Green, supra*, 27 Cal.3d at p. 54.) This overlooks the evidence of defendant's own admissions as provided by Harris: defendant said he took three prostitutes to the country, had sex with them, and then took their money. When they became angry and started fighting, defendant feared he would be accused of rape so he put each one to "sleep" by beating and choking them to death. There was thus evidence from which the jury could have reasonably concluded defendant formulated the intent to rob before he killed.

### f. *Assault of Jacqueline Frazier*

■ The jury convicted defendant of assault as a lesser included offense to the charged rape. He contends there was insufficient evidence of assault. We reject the notion. There was ample evidence that defendant was Frazier's assailant; the evidence that she was missing some of her rings, that she was partially unclothed, and that she had been beaten about the head and neck with a blunt instrument, provides sufficient evidence of assault.

### 4. *Impeachment on Collateral Matters*

Prior to trial, defense counsel advised the trial court that he intended to impeach certain prosecution witnesses with the fact that they had failed to reveal their income as prostitutes when applying for county welfare benefits. Because these averments were made under oath, counsel characterized the false swearings as felonious perjury and thus relevant to each witness's veracity. The prosecutor objected and the trial court ruled that such evidence would be precluded under Evidence Code section 352.[8] The court stated its decision, however, was without prejudice.

Before the defense cross-examined Gayle H., the issue resurfaced. The trial court expressed concern that such evidence would consume a considerable amount of time, especially because the witnesses would probably invoke the Fifth Amendment, necessitating appointment of independent counsel for them. The prosecutor stated at least one witness informed him she would invoke her Fifth Amendment rights but that another was not receiving county assistance at the relevant times in question. Defense

---

[8] "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

counsel replied that if a witness refused to testify, county welfare officials could be called to the stand. The court replied that counsel's proposed solution would consume even more time on this collateral matter. After hearing argument on the issue, the court ruled the evidence was inadmissible, citing Evidence Code section 352.

 Defendant contends his constitutional right to confront the witnesses against him was violated by the trial court's ruling. (U.S. Const., Amends. VI, XIV; Cal. Const., art. I, § 15.) Although we recognize that a criminal defendant has a constitutional right to present all relevant evidence of *significant* probative value in his favor (*People* v. *Northrop* (1982) 132 Cal.App.3d 1027, 1042 [182 Cal.Rptr. 197], disapproved on another ground in *People* v. *Smith* (1984) 35 Cal.3d 798, 808 [201 Cal.Rptr. 311, 678 P.2d 886]; *People* v. *Reeder* (1978) 82 Cal.App.3d 543, 553 [147 Cal.Rptr. 275]), "[t]his does not mean that an unlimited inquiry may be made into collateral matters; the proffered evidence must have more than 'slight-relevancy' to the issues presented." (*Northrop, supra,* at p. 1042.) " '[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' " (*People* v. *Harris* (1989) 47 Cal.3d 1047, 1091 [255 Cal.Rptr. 352, 767 P.2d 619], quoting *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 679 [89 L.Ed.2d 674, 683, 106 S.Ct. 1431].) Because the evidence in question would impeach the witnesses on collateral matters and was only slightly probative of their veracity, application of Evidence Code section 352 to exclude the evidence did not infringe defendant's constitutional right to confront the witnesses against him.

Moreover, the trial court did not abuse its discretion by excluding the proffered evidence. After the court carefully weighed the probative value of the evidence with the possibility that the various witnesses would invoke their Fifth Amendment rights, resulting in the undue consumption of time taken up on this collateral matter, the trial court properly excluded the evidence. Even if we assume the court abused its discretion, no prejudice appears. Each of the witnesses in question admitted she made her living by prostitution, an illegal profession. In addition, many admitted to various other transgressions. For example, Gayle H. admitted a prior burglary conviction and heroin addiction. Dorothy T. admitted being arrested for loitering, and both Lydia L. and Rhonda S. admitted to having drug problems. Thus, the jury had before it ample evidence impeaching the trustworthiness of these witnesses aside from any possible falsity on their applications for general assistance.

Finally, defendant contends that although the trial court purported to rely on Evidence Code section 352, the true basis of its decision was Evidence Code section 787, which prohibits evidence of specific instances of conduct to "attack or support the credibility of a witness." In so doing, he claims, the court erred because that section was superseded by article I, section 28, of the state Constitution, the so-called "Truth-in-Evidence" provision.

We reject the claim because the premise is faulty; at most, the record shows the court relied on alternative rationales. In discussing the issue in chambers, the court alluded to both Evidence Code sections 1101 and "Section 786 through 790." It went on, however, to say, "Again, I believe this area is covered by 352 of the Evidence Code." At the end of his argument on the matter, the prosecutor stated "I think the Court [should] exclude both matters under 352 of the Evidence Code." After hearing defense counsel's arguments, the court stated, "The Court's ruling will remain the same for the reasons previously stated and, in addition, the Court finding the probative value is outweighed by the—by a possible prejudice, undue consumption of time and possible confusion to the jury. Court's excluding it under 352 in addition to 1101, Subparagraph (b)." The record clearly shows the trial court was relying on Evidence Code section 352 rather than Evidence Code section 787. We thus need not decide whether Evidence Code section 787 survived passage of article I, section 28, of the state Constitution.

### 5. References to Defendant's Criminal History

Defendant argues three isolated examples of volunteered, nonresponsive answers given by witnesses require reversal. The first incident occurred when defense counsel was cross-examining Albert Aranda, who stated he first met defendant in 1984. When asked whether he was sure, Aranda stated, "Sometime in there because he'd just gotten . . . out of prison." The second incident also took place during defense counsel's cross-examination of a prosecution witness. During the questioning of defendant's mother, Artis Williams, she blurted out that she had gone to prison to see defendant. Her answer was nonresponsive to counsel's question. The final challenged episode occurred during direct examination of Detective Rascon. The prosecutor was trying to pinpoint the exact date of a statement defendant made to Louisia Thomas. Rascon replied the statement was made "approximately a month prior to defendant's last arrest."[9] As a result of

---

[9] This reference apparently concerned defendant's initial arrest for crimes involving Janyce B. He was later released from custody before being later arrested for the homicides at issue in this case.

these statements, the jury learned that defendant had both been previously arrested and in prison.

Defendant contends the jury's receipt of this prejudicial information requires reversal. He is mistaken. The record shows that after each incident, the trial court discussed the admission of the improper information with both defense counsel and the prosecutor. The court clearly appreciated the potential prejudice and left it to counsel to propose an appropriate remedial action. For example, after Aranda's testimony, the court noted its "potential prejudice" but said, "I just raise it now and we can deal with it at some appropriate time. Perhaps, through instructions or by stipulation of counsel." The prosecutor also said he would leave the appropriate remedy to defense counsel.

Following Artis Williams's testimony, the court asked counsel: "[D]o you want to consider the matter further and handle it by a formal jury instruction, or I can orally instruct the jury, or we can drop it, of course, depending on what your perception is of that testimony and how it's being viewed by the jury." Counsel replied, "I'll just think about it for a moment." The court continued and commented that it thought Williams's remark referred to visiting defendant in county jail, not prison, but that making that distinction to the jury "would highlight that particular statement or statements that she made." Counsel said, "I don't know yet, Your Honor."

Although the trial court was solicitous of defense counsel's wishes on this matter, counsel never objected, moved to strike, or requested any other remedial action be taken. Given the discussions on the matter between the court and counsel, we conclude counsel's failure to object or request a curative admonition (or seek some other remedy such as a special jury instruction or stipulation from the prosecutor) constituted a waiver of the issue. (Evid. Code, § 353.) The possibility that any curative action would highlight the improper information was clearly posed by the trial court and we assume counsel took that possibility to heart.

Defendant contends no objection was necessary because the prejudice flowing from the improper remarks could not have been cured. He argues, in effect, for application of a reversal per se standard for the unintentional admission of evidence showing prior arrests or convictions. He fails, however, to provide persuasive authority showing such a standard is proper. In *People* v. *Ozuna* (1963) 213 Cal.App.2d 338[28 Cal.Rptr. 663], cited in support, the defendant's ex-convict status was *intentionally* elicited from a prosecution witness by the deputy district attorney. Even then the Court of Appeal did not apply a per se reversal standard; it noted that this type of

error "frequently" required reversal and went on to discuss whether the trial court's admonition cured the harm. *People* v. *Roof* (1963) 216 Cal.App.2d 222 [30 Cal.Rptr. 619], also cited by defendant, is similarly distinguishable. In *Roof*, a case involving grand theft, a police officer testified and revealed the defendant had been charged with contributing to the delinquency of a minor. Although *Roof*, like *Ozuna* and unlike the present case, involved the *intentional* revelation of a prior arrest, the Court of Appeal did not automatically reverse the judgment. Instead, the court weighed the error against the harm caused by the admission of the officer's testimony. Neither *Ozuna* nor *Roof* holds that testimony that is nonresponsive to questioning, but nevertheless relates a defendant's prior criminal history, is always prejudicial.

Because defendant fails to establish that testimony revealing his ex-convict status, and his prior arrest, is so prejudicial that its admission must always result in reversal of the judgment, we hold counsel's failure to object or seek some other form of remedial action waived the issue for appeal.

6. *Ineffective Assistance of Counsel*

Defendant contends his trial counsel was ineffective in a variety of ways, thereby depriving him of his constitutionally guaranteed right to counsel. (U.S. Const., Amend. VI; Cal. Const., art. I, § 15.) As we discussed, *ante*, at page 357, defendant must demonstrate both deficient performance and prejudice before he is entitled to relief. (*Ledesma*, *supra*, 43 Cal.3d at pp. 216-217.) We consider defendant's claims seriatim.

a. *Failure to Demur*

Defendant first argues counsel was ineffective for failing to demur to the information because of its alleged uncertainty. We discussed this issue, *ante*, at pages 357-359, concluding that relief is not warranted because no prejudice resulted from the failure to demur.

Defendant further argues that because counsel failed to demur, we can infer that he also failed to investigate whether defendant could have presented a credible alibi defense. As the People point out, however, there is nothing in the record supporting this inference. Although trial counsel clearly has a duty to adequately investigate possible defenses to enable formulation of an informed trial strategy (see *Ledesma*, *supra*, 43 Cal.3d at p. 222), we will not presume from a silent record that counsel failed in this duty. (See *id*. at p. 218, quoting *People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1] [no reversal on appeal when record does not reveal why counsel failed to act].)

### b. *Inadequate Support of the Change of Venue Motion*

██ Defendant next contends counsel was remiss in failing to provide greater documentary support for the change of venue motion. Counsel provided the court with six articles from the leading local newspaper and the report from Dr. Holder, the defense expert who conducted a survey on the effect of publicity surrounding the crime. Defendant now argues that counsel should have presented evidence documenting the publicity given defendant's case by the electronic media. He fails, however, to inform us whether such evidence existed[10] or whether it was particularly inflammatory. There being no evidence in the record of the nature and extent of the publicity in the electronic media, we cannot assess the prejudice flowing from counsel's omission even if we were to conclude his conduct fell below constitutional standards. As such, defendant's "claim of ineffective assistance of counsel is more appropriately made in a petition for habeas corpus." (*Pope, supra,* 23 Cal.3d at p. 426.)

### c. *Withdrawal of the Severance Motion*

██ Defendant next asserts his trial counsel was ineffective for withdrawing a motion for severance. The record shows counsel had moved to sever the homicide and related counts (the murder counts) from those charges involving crimes wherein the surviving victims would testify that defendant had beat and raped them (the rape counts). During discussions on the motion, the prosecutor expressed his opposition to severance, indicating that he believed the evidence of the rape counts would be cross-admissible against the murder counts because it revealed defendant's modus operandi. The trial court appeared unsure about the cross-admissibility argument and requested further briefing, noting that it was inclined to deny the severance motion.

At a later hearing, the prosecutor averred that if severance was granted, he would try the rape counts before trying the murder counts. He explained that it would be strategically advantageous at the anticipated penalty phase of the murder trial to be able to document the rape counts with convictions. After conferring with defendant, defense counsel withdrew the motion for severance. The trial court stated the withdrawal of the motion was without prejudice.

Defense counsel explained his reasons for withdrawing the motion: "The motion was withdrawn because it was indicated that in the event the Court

---

[10] We note that Dr. Holder's report shows that when asked whether they saw coverage of defendant's case on television, 48 percent of those surveyed answered "yes," 40 percent answered "no," and 12 percent answered "don't know."

granted severance . . . it was the prosecution's representation at the time that under such circumstance, they would proceed with the case against the live victims. . . . [If defendant was convicted of any of those crimes,] then he could be impeached with those prior convictions." Counsel continued: "And it just seemed to me as a matter of strategy that it would be better from the point of view of the defense to have these matters together unless the prosecution was willing to prosecute the case with the deceased victims first as opposed to vice versa. In other words, it could be indicated that the strong cases [i.e., the rape counts] were being used to bootstrap the [murder counts] and the ones that were being pulled up will be the ones whose penalty will be much more serious than the others. And I feel as if in the way that we're doing it, *it's a possibility under certain circumstances for the jury to compromise in the other direction.*" (Italics added.)

Later, the trial judge went in chambers with defense counsel only and discussed counsel's strategy on the record. The judge admitted that at the time defendant made the severance motion, he was inclined to grant it. Counsel reiterated his strategic decision against seeking a severance in order to prevent the prosecution from obtaining felony convictions on the rape counts that could then be used to impeach defendant at a later trial on the murder counts.[11] Counsel explained that he believed it was important that the same jury assess defendant's credibility for both the murder counts and the rape counts. If the charges were severed, he said, he would lose the advantage of having defendant's credibility judged against that of the rape victims, whose trustworthiness, he believed, was impaired because they were prostitutes. He said he wanted to avoid defendant's impeachment with

---

[11] The following dialogue occurred in an in camera hearing from which the prosecutor was excluded:

"THE COURT: And it was my understanding from your comments, Mr. Goodwin, that you felt you would prefer to have the present situation with no severance because you believe that the question of credibility was going to be the all important matter, that you intended to call Mr. Jennings as a—as a witness in the guilt phase. Perhaps I'm wrong. But I gather that you were going to place his credibility against the—in essence the testimony of six prostitutes, and you would rather have that situation . . . than run the risk of having a separate trial on six rape victims, possibly to wind up with a number of convictions which could then subsequently be used against Mr. Jennings in a—the homicide counts, possibly—

"MR. GOODWIN [defense counsel]: Those issues would have already been decided.

"THE COURT: And which would either force Mr. Jennings to take the stand, facing impeachment on a number of . . . convictions, or keeping him off the stand entirely. And it's your assessment of the case that Mr. Jennings testimony is—was very crucial. It's your intention to call him in the guilt phase of the trial.

"MR. GOODWIN: Well, it's my intention to do it. However, it, uh,—it's not a—it's something that hasn't been decided at this time.

"THE COURT: No, I'm not asking for a commitment. But I think from your point of view and your client's point of view, that going into the trial, that's your anticipated strategy and that's the reason for not severing out those counts.

"MR. GOODWIN: That's correct."

felony convictions where the jury did not have the opportunity to evaluate "the character and quality of the testimony that might have convicted him."

Defendant contends his attorney's tactical decision fell below prevailing norms for effective counsel, arguing that when the court indicated in the in camera hearing that it was of a mind to grant the motion, counsel should have immediately renewed it. As fully documented on the record, however, counsel had a sound strategic reason for desiring a joint trial. Thus, the merit of the severance motion is not dispositive here; counsel did not want separate trials even if he could have had them.

The strategy, moreover, was a reasonable one. Given the amount of incriminating evidence against defendant, counsel could have reasonably believed that his best strategy was to attempt to show defendant was more credible than the six prostitutes who testified against him. If the jury would believe defendant's denials as to the rape counts, perhaps it would start to doubt the evidence of the murder counts. Should the trials be severed and defendant convicted of the rape counts, his credibility before the jury trying the murder counts would be diminished.

Defendant further argues that he was prejudiced by counsel's decision because he was found not guilty of the charges involving Rhonda S. and the jury could not agree on the charges involving Sharon H. and Dorothy T. He claims there is no reason to believe the results would have been any different in separate trials. Had counsel renewed the severance motion, defendant claims, the jury trying the murder counts would never have heard the evidence concerning the Rhonda S., Sharon H., and Dorothy T. charges. We cannot, however, base our evaluation of the efficacy of counsel's tactical decision solely on the results achieved in a joint trial. We have previously warned that " 'it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.' " (*Ledesma, supra,* 43 Cal.3d at p. 216, quoting *Strickland* v. *Washington, supra,* 466 U.S. at p. 689 [80 L.Ed.2d at p. 694].)

Counsel obviously did not know defendant would receive favorable verdicts on the counts involving Rhonda S., Sharon H., and Dorothy T., nor can we conclude from the record that he reasonably should have known. From the pretrial perspective under which counsel operated, it was reasonable for him to speculate that the People might garner convictions for all the rape counts. His reasonable tactical decision to acquiesce to a joint trial is not rendered unreasonable merely because the jury returned verdicts favorable to the defense on some of the rape counts.

Defendant next claims trial counsel's decision to withdraw the severance motion was unreasonable because counsel failed to consider (1) whether the trial court might have ordered the prosecutor to try the murder counts first, or (2) whether the court would have precluded the use of any convictions on the rape counts to impeach defendant at a later trial on the murder counts. We disagree. Defendant does not cite any authority for his proposition that the court could have forced the People to try the murder counts before the rape counts, nor are we aware of any such authority. His reliance on *People* v. *Jasper* (1983) 33 Cal.3d 931 [191 Cal.Rptr. 648, 663 P.2d 206] is misplaced. In *Jasper*, this court merely held that although it was preferable to hold a trial on criminal charges before a probation revocation hearing on those same charges, "[w]hether a revocation hearing should be held before trial rests in the reasonable discretion of the trial court." (*Id.* at p. 935; see also *People* v. *Weaver* (1985) 39 Cal.3d 654 [217 Cal.Rptr. 245, 703 P.2d 1139] [*Jasper* rule survives enactment of Cal. Const., art. I, § 28, subd. (d)].)

This case is manifestly distinguishable from the situation in *Jasper, supra*, 33 Cal.3d 931. Unlike the situation there, where the revocation hearing and the criminal trial were based on the same alleged criminal acts, defendant's case involved separate criminal acts. Moreover, even were we to accept the proposition that the trial court possessed discretion to order the People to proceed on the murder counts first, there is nothing in the record showing the court would have done so. Viewing the "circumstances as they stood at the time that counsel acted" (*Ledesma, supra*, 43 Cal.3d at p. 216), we cannot say counsel's decision to seek a joint trial was so uninformed or misguided that defendant was deprived of his constitutionally guaranteed right to counsel.

Nor is it clear counsel failed to consider the possibility that the trial court might prohibit the prosecution from using any convictions on the rape counts to impeach. In light of the large number of charges against defendant, counsel could reasonably have concluded that there was only a small chance that he could convince the court to exclude enough of the resulting convictions to have even a marginal effect on a subsequent trial on the murder counts. Moreover, that counsel "might" have convinced the trial court to prohibit his impeachment with any of the convictions on the rape counts, as defendant argues, does not demonstrate counsel was ineffective. Appellate courts will not secondguess a trial attorney's reasonable tactical decisions (*Ledesma, supra*, 43 Cal.3d at p. 216), and the mere fact that counsel, had he chosen another path, "might" have convinced the court to issue a favorable evidentiary ruling, is not enough to carry defendant's burden on demonstrating that " 'counsel's representation fell below an objective standard of reasonableness . . . under prevailing professional

norms.' " (*Ibid.*, quoting *Strickland* v. *Washington, supra*, 466 U.S. at p. 688 [80 L.Ed.2d at pp. 693-694].)

We conclude defense counsel's decision to withdraw the severance motion was based on a reasonable tactical decision and did not constitute ineffective assistance of counsel.

### d. *Failure to Move for a Mistrial*

■ Citing the jury's reception of the improper statements of Albert Aranda, Artis Williams, and Detective Rascon discussed, *ante*, at pages 373-375, defendant contends that counsel was ineffective for failing to move for a mistrial. We disagree. ■ "A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.] ■ Accordingly, it would be a rare case in which the merits of a mistrial motion were so clear that counsel's failure to make the motion would amount to ineffective assistance." (*People* v. *Haskett* (1982) 30 Cal.3d 841, 854 [180 Cal.Rptr. 640, 640 P2d 776].)

The record shows that following the admission of the challenged statements, the court asked counsel whether he wanted the matter remedied by a jury admonition, jury instruction, or by a stipulation of the parties. In addition, the court told defense counsel that "we can just drop it, of course, depending on what your perception is of that testimony and how it's being viewed by the jury." From this statement, we can infer that the trial court did not consider the three isolated incidents of blurted-out, nonresponsive answers incurably prejudicial. We agree with this implied assessment of the potential prejudice and conclude counsel was not remiss in failing to move for a mistrial.

### e. *Inadequate Opening Statement*

■ Defense counsel's opening statement was brief, covering just two pages in the record. He asserted the defense position that many of the prosecution witnesses were not telling the truth. He urged the jury to evaluate these witnesses carefully, noting that many would not be testifying from memory but would instead be simply recounting a statement previously given to police. He also explained that many of the witnesses were afraid to testify and that many of the crimes of which the defendant was charged were not initially reported by the victims.

Emphasizing the brevity of the statement, defendant argues that although the decision whether to give an opening statement is a discretionary tactical choice (*People* v. *Pangelina* (1984) 153 Cal.App.3d 1, 6 [199 Cal.Rptr. 916]), once counsel decides to make an opening statement, he must give a good one. Length, however, does not necessarily equate with quality. Moreover, defendant does not explain what critical matters counsel omitted from his statement. We cannot fault counsel's performance on such a meager showing. (See *People* v. *Wade* (1988) 44 Cal.3d 975, 989 [244 Cal.Rptr. 905, 750 P.2d 794].)

Defendant attempts to bolster his argument by claiming that such a short opening statement "could only have served to precondition the jurors to the fact that they were not going to see much of a defense. Inasmuch as that was the major message it conveyed, the opening [statement] did more harm than good." This is an unreasonable interpretation of the opening statement. The defense theory was that the bulk of the People's case was based on the untrustworthy statements of prostitutes. This defense was not makeweight; witness the favorable jury verdicts in the Rhonda S., Sharon H., and Dorothy T. matters. We conclude counsel's decision to give a concise opening statement did not constitute ineffective representation.

### f. *Failure to Object to Court Order That Subpoenaed Witnesses Appear at the District Attorney's Office*

■ Defendant also submits counsel provided ineffective assistance by failing to object when the trial court ordered several previously subpoenaed prosecution witnesses to appear at the district attorney's office on the day they were scheduled to testify. Defendant claims the court's authority extended only to compelling the witnesses to appear in court. He does not, however, attempt to demonstrate how counsel's omission led to the withdrawal of a potentially meritorious defense or otherwise prejudiced him. We thus reject the claim.

### 7. *Instruction on Jury Note-taking*

■ The trial court instructed the jury that it could take notes but cautioned the jurors not to let note-taking interfere with their ability to listen to and observe each witness. Defendant complains the court erred by failing to further instruct the jury, sua sponte, that their notes should not take precedence over their independent recollection that they should not be influenced by the fact that other jurors were taking notes, and that in the event of a discrepancy between their notes and their recollection they should request a rereading of the transcript.

He is mistaken. The court instructed the jury with CALJIC No. 17.48 (1985 new) (4th ed. pocket pt.), which incorporates the very points that defendant claims were omitted. (See *People* v. *Ghent* (1987) 43 Cal.3d 739, 757-758 [239 Cal.Rptr. 82, 739 P.2d 1250]; *People* v. *Whitt* (1984) 36 Cal.3d 724, 746-747 [205 Cal.Rptr. 810, 685 P.2d 1161]].) Moreover, a trial court is not required to give the instruction absent a request. (*People* v. *Harris, supra,* 47 Cal.3d at p. 1096.)

8. *Ex Parte Communication With the Jury*

Beginning on the first day of jury deliberations, defendant repeatedly waived his right to be present when the jury was excused for the day. Prior to excusing the jury on June 10, 1986, the trial court discussed with the jury foreman, Mr. Bordwine, the schedule of deliberations worked out by the jurors. Bordwine asked the court whether he should keep it apprised of any progress. The court replied: "That may be something down the road. . . . I think if it—only if it becomes a problem. I don't believe it will be necessary. You should continue at your own pace. If you feel there's a point where you reach a problem area, perhaps at that time, we can either—if you have reached verdicts on certain counts, then those verdict forms can be sealed and we could hold—I'll hold them until such time as you feel you have either reached a decision on all counts or have got to the point where you feel you've gone as far as you can go. [¶] But again, I will wait for you to let us know. I'll advise the attorneys of that particular inquiry."

After making a few more comments about how the jury should go about their deliberations, the court asked if there were any more questions. Juror Barcus spoke up, and the following colloquy occurred:

"MR. BARCUS: I have one, my own personal question. If we come up to a[n] 11 to 1 decision on something, does that—does that drop then from the charges, or is that a mistrial or something or other?

"THE COURT: Well, that would be considered a deadlocked jury.

"MR. BARCUS: For all the other 23 counts?

"THE COURT: No, only on that one particular count.

"MR. BARCUS: On that particular count.

"THE COURT: That's why you treat each count separately. And if you're unable to reach a decision on one or more counts, they will be dealt with separately. And if we get to that point, then we'll discuss that matter

further. [¶] But in your deliberations, you are to try to reach a verdict on a count if it's possible. If it's not possible, then there will be other discussions we'll have with [myself] and the attorneys. [¶] The only thing I can tell you [is] just to proceed as you're going. And if you indicate you're making progress, that's fine. And if you reach a point where you are unable to do so and need further assistance, then bring that to our attention, whether that involves just one count or inability to reach a decision as to one or more counts, or whatever the situation is.

"MR. BARCUS: Thank you."

 Defendant contends this ex parte communication with the jury violated his federal constitutional rights to counsel, to be present, and to due process of law (U.S. Const., Amends. V, VI, XIV), similar rights under the state Constitution (Cal. Const., art. I, § 15), and various statutory rights. Before reaching the merits of the claim, however, we note that it appears defendant waived the issue. The morning after the ex parte communication, the trial court informed the prosecutor and defense counsel of its discussion with the jury, including the substance of its comments to Mr. Bordwine and Mr. Barcus. It then said, "If you want the court reporter to read back those notes to you, she'll be glad to do so. If you feel that it's necessary to give the jury further comment or further admonition with regard to their inquiry, I'll be glad to do so." Defense counsel Goodwin replied, "I'll listen to the notes a little later on today."

The court continued, stating, "Please review the notes, if you so desire, and just let me know if there's anything you think we should do in addition to what was done last evening." Goodwin replied, "I'll do that after I hear the rereading." Although the jury deliberated almost five more days, he failed to object. When Goodwin later filed a motion for a new trial, the court's ex parte communication with the jury was not enumerated as one of the bases for relief.

By failing to object or move for a mistrial based on the ex parte communication, defendant waived the error. (*People v. Garcia* (1984) 160 Cal.App.3d 82, 89 [206 Cal.Rptr. 468]; *People v. Chagolla* (1983) 144 Cal.App.3d 422, 432-433 [193 Cal.Rptr. 711]; see also *People v. Kageler* (1973) 32 Cal.App.3d 738, 745-746 [108 Cal.Rptr. 235] [addressing § 1138 violation only].) Although defendant argues the error impinged on his constitutional right to counsel and should thus be nonwaivable and reversible per se, both the United States Supreme Court (*Rushen v. Spain* (1983) 464 U.S. 114, 118-119 [78 L.Ed.2d 267, 273, 104 S.Ct. 453]) and this court (*Wright, supra,* 52 Cal.3d at p. 403) have held that unauthorized ex parte communications with the jury need not result in reversal if the improper contact was

harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].) "While denial of counsel at the critical stage of a criminal proceedings is not prejudicial as a matter of law, prejudice will be presumed if the denial may have affected the substantial rights of the accused. Only the most compelling showing to the contrary will overcome the presumption. The court must be able to declare a belief the denial of counsel was harmless beyond a reasonable doubt." (*People* v. *Knighten* (1980) 105 Cal.App.3d 128, 133 [164 Cal.Rptr. 96]; see also *People* v. *Hogan* (1982) 31 Cal.3d 815, 849-850 [183 Cal.Rptr. 817, 647 P.2d 93].)

 Moreover, it is questionable "whether a defendant should be permitted to sit back, await a jury verdict, and then assert error based on the court's improper communication with the jury" (*Garcia, supra,* 160 Cal.App.3d at p. 89), at least when the improper communication was relatively minor. (*Knighten, supra,* 105 Cal.App.3d at p. 132 [assuming error is waivable but holding "the potential significance of the error is arguably sufficient to negate the waiver"].)

In this case the ex parte communication occurred as the result of an informal question by the jury concerning the possible outcome if the jury should deadlock as to a single count. Although the trial court should have deferred answering the question until both the prosecutor and defense counsel could be notified,[12] its response was a correct statement of law and it gave the parties prompt notice of its misstep. Under such circumstances, the "potential significance of the error" was slight and the failure to object precludes assertion of the error on appeal.

Moreover, even were we to reach the issue, no relief is warranted. "It has long been the rule that the trial court should not entertain communications from the jury except in open court, with prior notification to counsel." (*Hogan, supra,* 31 Cal.3d at p. 848.) " 'This rule is based on the precept that a defendant should be afforded an adequate opportunity to evaluate the propriety of a proposed judicial response in order to pose an objection or suggest a different reply more favorable to the defendant's case.' " (*Wright, supra,* 52 Cal.3d at p. 402, quoting *Garcia, supra,* 160 Cal.App.3d at p. 88.)

 We find the error in this case was harmless for two reasons. First, nothing in the court's admonition to the jury was an incorrect statement of

---

[12] Section 1138 directs that, "After the jury have retired for deliberations, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

law. (Compare *Hogan, supra,* 31 Cal.3d at p. 850 [without notifying counsel, court gave jury tape of conversation containing "inadmissible and highly prejudicial material"; held reversible error], with *People* v. *Woods* (1950) 35 Cal.2d 504, 512 [218 P.2d 981] [trial court's ex parte communication with juror explaining meaning of term "hung jury"; held harmless error].) The court correctly informed the jury that a deadlock on a single count would not affect the other 23 counts. The court then encouraged the jury to try to reach a verdict on each count and indicated that if the jury was unable to reach a decision as to any one count, it was simply to inform the court of that fact. Significantly, defendant does not explain in what manner the court's admonition was erroneous. Thus, the trial court's response to the juror's question did not implicate defendant's substantial rights.

Second, the court promptly notified defense counsel of its action and encouraged counsel to review the court reporter's notes and suggest a further admonition, if desired. Indeed, the court commented that it would "be glad to" further instruct the jury on this point should counsel wish it. Under these circumstances, even assuming defendant did not waive the issue for appeal, we find any error was harmless beyond a reasonable doubt.

### 9. *Reasonable Doubt Instructions*

By supplemental letter brief, defendant argues the reasonable doubt instructions provided his jury were faulty and require reversal. Although he cites *Cage* v. *Louisiana* (1990) __ U.S. __ [112 L.Ed.2d 339, 111 S.Ct. 328] (per curiam), in support, that case is distinguishable. In *Cage,* the jury was instructed that it must acquit if it entertained a reasonable doubt about the accused's guilt. The term "reasonable doubt," however, was defined as a doubt " 'founded upon a real tangible substantial basis and not upon mere caprice and conjecture. It must be such doubt as could give rise to a grave uncertainty . . . . It is an actual substantial doubt.' " (*Cage, supra,* at p. __ [112 L.Ed.2d at p. 342, 111 S.Ct. at p. 329], italics omitted.)

The high court reversed, reasoning that the trial court's jury instruction improperly "equated a reasonable doubt with a 'grave uncertainty' and an 'actual substantial doubt," and stated that what was required was a 'moral certainty' that the defendant was guilty." (*Cage* v. *Louisiana, supra,* __ U.S. at p. __ [112 L.Ed.2d at p. 342, 111 S.Ct. at p. 329].) Later, the high court concluded that "a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." (*Id.* at p. __ [112 L.Ed.2d at p. 342, 111 S.Ct. at p. 330].)

By contrast, the jury in this case was given the standard pattern jury instructions on reasonable doubt and the consideration of

circumstantial evidence. Thus, reasonable doubt was defined as "not a mere possible doubt because everything relating to human affairs and depending on moral evidence is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge." (See CALJIC No. 2.90 (4th ed. 1979).) Thus, unlike *Cage* v. *Louisiana, supra,* there was no transformation of true reasonable doubt, as it has been traditionally defined, into a higher degree of doubt.

Defendant's jury was also given the following instruction: "If . . . one interpretation of [circumstantial evidence] *appears* to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable." (CALJIC No. 2.01 (1979 rev.), italics added; see also CALJIC No. 2.02 (1979 rev.) [using similar language regarding circumstantial evidence of specific intent].) Defendant argues the use of the word "appears" in these jury instructions "eviscerates the federal and state constitutional requirement of proof beyond a reasonable doubt." We disagree. The plain meaning of these instructions merely informs the jury to reject unreasonable interpretations of the evidence and to give the defendant the benefit of any reasonable doubt. No reasonable juror would have interpreted these instructions to permit a criminal conviction where the evidence shows defendant was "apparently" guilty, yet not guilty beyond a reasonable doubt.

By parity of reasoning, we reject defendant's argument that the reasonable doubt instructions "mandated" the jury to draw a particular inference pointing towards guilt. Read in context, the instructions merely require the jury to reject unreasonable interpretations of the evidence, and to accept the reasonable version of the events which fits the evidence.

*Special Circumstance Issues*

1. *Corpus Delicti*

 Defendant contends the trial court erred by failing to instruct the jury that the corpus delicti rule applies to felony-based special circumstances. This failure, he argues, requires that we reverse the five felony-based special circumstances found by the jury. We disagree. Although we have previously ruled that the corpus delicti rule applies to felony-based special circumstances (*Robbins, supra,* 45 Cal.3d at p. 885; *People* v. *Mattson* (1984) 37 Cal.3d 85, 93-94 [207 Cal.Rptr. 278, 688 P.2d 887]; but see *People* v. *Morales, supra,* 48 Cal.3d at p. 559 [corpus delicti rule does not

apply to nonfelony-based special circumstances]),[13] the trial court's failure to deliver a specific instruction on this point was manifestly harmless. The jury was clearly instructed on the elements of rape and robbery as well as the requirement that it find that the evidence establish the corpus delicti of these crimes without defendant's extrajudicial statements. (See CALJIC No. 2.72.) By convicting defendant of all the charged rape and robbery counts associated with the four homicide victims, the jury necessarily decided the People had proved the corpus delicti of those crimes. Thus, the jury necessarily resolved against defendant the factual question posed by the omitted instruction. (See *People v. Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913], disapproved on another ground in *People v. Flannel* (1979) 25 Cal.3d 668, 684-685, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1].) Under these circumstances, any instructional error was harmless.

### 2. *Insufficient Evidence*

Resurrecting his earlier, related claims, defendant asserts the felony-based special circumstances must fall because there was insufficient evidence of the underlying felonies. Specifically, he claims there was insufficient evidence showing he killed Linda Johnson, Olga Cannon, and Jacqueline Frazier in order to advance an independently felonious purpose (*Green, supra*, 27 Cal.3d at p. 61), or that he formed the intent to rob prior to the killings. (*Id.* at pp. 52-53.) As discussed earlier, defendant's many admissions to A.C. Harris, David Pulley, Kenny Smith, and others, as well as the web of circumstantial evidence implicating him in the crimes, provides substantial evidence supporting the findings that defendant intended to—and did—rob Johnson of her blue Cadillac and Cannon of her money and purse. Moreover, the jury was instructed on this precise point and told that "the special circumstance . . . is not established if a rape or robbery was merely incidental to the commission of the murder."

To the extent defendant challenges the sufficiency of the evidence of the rape special circumstance in connection with the Johnson slaying, we note he confessed to Harris that he raped Johnson before killing her. As stated, *ante*, there was sufficient evidence that defendant forcibly raped Cannon before killing her with a crowbar. The jury did not sustain the rape charge or the rape-murder special circumstance as to Frazier.

---

[13] We note the Penal Code was recently amended to provide that the corpus delicti rule does *not* apply to felony-based special circumstances, thereby overturning the *Mattson* and *Robbins* holdings. (See § 190.41; see also Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Primary Elec. (June 5, 1990), Prop. 115, text of proposed law, p. 67 [enacting § 190.41 by initiative].)

### 3. Multiple-murder Special Circumstance

■■■ Although defendant does not raise the issue, it was improper for the jury to sustain more than one multiple-murder special-circumstance allegation. (*People* v. *Hernandez* (1988) 47 Cal.3d 315, 357 [253 Cal.Rptr. 199, 763 P.2d 1289]; *People* v. *Allen* (1986) 42 Cal.3d 1222, 1273 [232 Cal.Rptr. 849, 729 P.2d 115] [lead opn. by Grodin, J.].) We thus set aside two of the three section 190.2, subdivision (a)(3) findings.

*Penalty Phase Issues*

### 1. Consideration of Time-barred Misdemeanor Conviction

Section 190.3, factor (b), states that when the trier of fact determines the appropriate penalty, it may take into consideration "The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." During the penalty phase of the trial, the jury was permitted to consider defendant's misdemeanor conviction for assault (§ 240), returned as a lesser included offense to the charge that he raped Karen Robinson.

Defendant contends that because the felony complaint was not filed until more than a year after the alleged crime, the misdemeanor assault conviction was time barred. (See § 802 [prosecution of misdemeanors must begin within one year of the crime].) As a result, he claims, the trial court erred in permitting the jury to consider this misdemeanor conviction when deciding the appropriate penalty. ■■■ We have previously concluded, however, that section 190.3, factor (b), " 'imposes *no* time limitation on the introduction of "violent" crimes; the jury presumably may consider criminal violence which has occurred at any time in the defendant's life.' " (*People* v. *Heishman* (1988) 45 Cal.3d 147, 192 [246 Cal.Rptr. 673, 753 P.2d 629], quoting *Balderas, supra,* 41 Cal.3d at p. 202.) Thus, "evidence of a defendant's criminal acts that is otherwise eligible for introduction and consideration under section 190.3, factor (b), is not subject to exclusion on the ground that prosecution for those acts would be barred by a statute of limitations." (*Heishman, supra,* at p. 192.)

### 2. Assault on Betty Burrell

■■■ Betty Burrell testified at the penalty phase of the trial and stated defendant assaulted her with a butcher knife. Although Burrell testified against defendant in a preliminary hearing, the charges were dropped when defendant accepted a plea bargain and pleaded guilty to assaulting Henry

Jones with a deadly weapon. Defendant now complains that evidence of this incident should not have been admitted at the penalty phase because the trial court failed to hold a pretrial hearing to determine whether an assault actually occurred. In support, he relies on this court's pronouncement in *People* v. *Phillips* (1985) 41 Cal.3d 29 [222 Cal.Rptr. 127, 711 P.2d 423].

In *Phillips*, a case arising under the 1977 death penalty law, this court opined that "in many cases it may be advisable for the trial court to conduct a preliminary inquiry before the penalty phase to determine whether there is substantial evidence to prove each element of the other criminal activity." (41 Cal.3d at p. 72, fn. 25.) We did not, however, require such a hearing nor predicate admission of such evidence on the holding of a hearing.

The facts of the present case clearly illustrate why such a hearing may be unnecessary in some cases. Here, Burrell testified and was subject to cross-examination. The prosecution presented evidence that defendant was charged by information with assaulting Burrell, that she testified against him in a preliminary hearing, and that he was held to answer for that crime. The jury was instructed on the elements of assault and informed that it must unanimously agree that those elements were proved by the evidence beyond a reasonable doubt. (*People* v. *Caro* (1988) 46 Cal.3d 1035, 1057 [251 Cal.Rptr. 757, 761 P.2d 680]; *Ghent, supra,* 43 Cal.3d at p. 774; *People* v. *Robertson* (1982) 33 Cal.3d 21, 53 [plur. opn.], 60 [conc. opn. of Broussard, J.] [188 Cal.Rptr. 77, 655 P.2d 279].)[14] Under such circumstances, there was no question that there existed "substantial evidence to prove each element of the [assault]" (*Phillips, supra,* 41 Cal.3d at p. 72, fn. 25), and that a preliminary hearing on the question was unnecessary. We conclude the trial court properly admitted the evidence of defendant's assault on Burrell.

3. *Consideration of the Rhonda S., Sharon H., and Dorothy T. Crimes*

■ Defendant contends the trial court erred in instructing the jury to "consider all of the evidence which has been received during any part of the trial of this case" (see CALJIC No. 8.84.1 (1986 rev.) (4th ed pocket pt.)), because he was acquitted of charges of forcible rape and oral copulation against Rhonda S. and the jury was unable to agree on similar charges against Sharon H. and Dorothy T. We agree the court erred in failing to tailor its instruction so as to exclude the evidence of the Rhonda S. crimes.

---

[14] Indeed, this latter instruction gave defendant extra protection because section 190.3 does not require jury unanimity. Instead, any single juror may consider evidence of criminal activity under that section if he or she is personally satisfied beyond a reasonable doubt that the activity occurred. (*Caro, supra,* 46 Cal.3d at p. 1057; CALJIC No. 8.87 (1989 rev.) (5th ed. pocket pt.).)

Section 190.3 expressly states that "in no event shall evidence of prior criminal activity be admitted for an offense for which the defendant was *prosecuted and acquitted*." (Italics added.) Because defendant was charged with and acquitted of the crimes against Rhonda S., the jury should not have been allowed to consider this evidence.

The crimes involving Sharon H. and Dorothy T. are a different matter, however, because defendant was not acquitted of those crimes. Instead, the jury was unable to reach a verdict and a mistrial was declared. We have strictly construed the statutory language requiring an "acquittal" to conclude it requires a determination of the merits. (*People* v. *Coleman* (1989) 48 Cal.3d 112, 148 [255 Cal.Rptr. 813, 768 P.2d 32].) Thus, we have held that dismissal of the charges, whether by section 995 motion (*Ghent, supra*, 43 Cal.3d at p. 774), or pursuant to a plea bargain (*Heishman, supra*, 45 Cal.3d at p. 193), does not constitute an acquittal for purposes of section 190.3. Consequently, defendant's jury was properly permitted to consider the evidence of the Sharon H. and Dorothy T. crimes, subject to the beyond-a-reasonable-doubt requirement discussed above. (*Ghent, supra*, at p. 774.)

Although the jury was improperly permitted to consider the Rhonda S. crimes, we perceive no prejudice. First, the jury was instructed not to consider evidence of other criminal activity unless it found beyond a reasonable doubt that defendant had committed the crime. Because the same jury has earlier acquitted defendant of the Rhonda S. crimes, we assume it followed the penalty phase instruction and accorded no weight to those crimes at the penalty phase.

Second, defendant was convicted of three counts of first degree murder, one count of second degree murder, five supportable special-circumstance allegations, as well as *numerous* counts of rape, robbery, arson, forcible oral copulation, and kidnapping. In addition, the prosecution proved at the penalty phase that defendant was guilty of additional violent crimes against Burrell, Gladys P., Chun Pegues, Janyce B., Henry Jones, and Rosemary Graham. The People thus presented overwhelming penalty phase evidence. Third, the prosecutor did not mention the Rhonda S. crimes in closing argument. Under these circumstances, there is no reasonable possibility that consideration of the alleged crimes against Rhonda S. could have improperly influenced the jury.

### 4. *Consideration of Excessive Special Circumstances*

We earlier concluded that the jury improperly sustained two of the three multiple-murder special-circumstance allegations. Although defendant does not raise the point, we conclude there is no reasonable possibil-

ity that the jury's consideration of these two "extra" special circumstances affected the penalty verdict. (*Hamilton, supra,* 48 Cal.3d at p. 1181; *Allen, supra,* 42 Cal.3d at pp. 1281-1282.)

### 5. *Failure to Object to the Adequacy of the Notice of Aggravating Factors*

■ Section 190.3 requires the prosecution to provide notice to a capital defendant of the aggravating evidence in the case. The purpose of the requirement is "to advise an accused of the evidence against him so that he may have a reasonable opportunity to prepare a defense at the penalty trial." (*People* v. *Miranda* (1987) 44 Cal.3d 57, 96 [241 Cal.Rptr. 594, 744 P.2d 1127].) The written notice the People provided defense counsel in this case was largely in the general language of section 190.3, without setting forth the particular nature of any piece of evidence.[15]

Defendant asserts defense counsel was ineffective for failing to object to the notice on the ground that it was too general and thus inadequate. Although we agree the written notice here was so general that it failed to comply with the "mandatory duty imposed by statute" (*Matthews* v. *Superior Court* (1989) 209 Cal.App.3d 155, 161 [257 Cal.Rptr. 43]), we nevertheless conclude counsel was not ineffective for failing to object. The notice, while facially deficient, clearly states that counsel had already been provided with all relevant reports. This fact was confirmed by defense counsel himself just prior to the penalty phase of the trial. The basis of the objection, then, would have been on strictly technical grounds inasmuch as defendant had actual notice of the aggravating evidence prior to trial. Under these circumstances, we cannot conclude counsel was ineffective; even if he was, we fail to perceive how defendant suffered any prejudice from counsel's omission. (*Ledesma, supra,* 43 Cal.3d at pp. 215-218.)

---

[15] The notice stated: "Please take notice that the People will rely on the following incidents and any and all evidence relevant to their proof are submitted as being within the provisions of Section 190.3 of the California Penal Code.

"1. The nature and circumstances of the offenses alleged in the instant action;

"2. All prior felony convictions that the defendant suffered;

"3. All criminal activity by the defendant which involved the express or implied threat to use force or violence;

"4. All relevant information pertaining to the defendant's character[,] background, history, mental condition, and physical condition.

"As of this date the defendant has been provided with all reports and background materials pertinant [sic] to the above aggravating factors that the People presently possess. The People's investigation, however, is a continuing one and the People reserve the right to supplement this evidence should any other or new evidence come into their possession. The People acknowledge their responsibility to supply this evidence to the defense as soon as possible. The defendant is requested to inspect the reports we do have on hand to ensure that no mistakes have taken place in the transmittal of prior discovery material."

CONCLUSION

The two multiple-murder special-circumstance findings (§ 190.2, subd. (a)(3)) are vacated. The guilt and penalty judgments are otherwise affirmed in their entirety.

Panelli, J., Arabian, J., and Baxter, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment in most respects. After review, I have generally found no error warranting reversal.

I dissent, however, as to the affirmance of defendant's conviction for the rape of Olga Cannon (Pen. Code, § 261) and the sustaining of the related felony-murder-rape special-circumstance finding (*id.*, § 190.2, subd. (a)(17)(iii)).

The general principles applicable here are well settled. "In every prosecution for crime, it is necessary [for the People] to establish the corpus delicti, i.e., the body or elements of the crime. These are, broadly speaking, (1) the fact of the injury, loss or harm, and (2) the existence of a criminal agency as its cause." (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Elements of Crime, § 136, p. 152, italics deleted.) "The significance of the corpus delicti concept lies in the rule that no part of it can be proved by the extrajudicial admissions or confession of the defendant." (*Id.*, § 137, at p. 153, italics deleted.) "The purpose of the rule is to protect the defendant against the possibility of fabricated testimony which might wrongfully establish the crime and the perpetrator." (*People* v. *Cullen* (1951) 37 Cal.2d 614, 625 [234 P.2d 1].) The People are not required to prove the corpus delicti beyond a reasonable doubt—but they are indeed required to make a prima facie showing as a matter of fact and not merely speculation. (See 1 Witkin & Epstein, *supra*, Elements of Crime, § 140, at p. 156.) Without such a showing, of course, any determination adverse to the defendant is unsupported as a matter of law. (See *Jones* v. *Superior Court* (1979) 96 Cal.App.3d 390, 398 [157 Cal.Rptr. 809]; *People* v. *Coppla* (1950) 100 Cal.App.2d 766, 771 [224 P.2d 828].)

In the case at bar, the People failed to establish the corpus delicti of the crime of rape and the related special circumstance of felony-murder-rape. The corpus includes unconsented-to sexual intercourse and, specifically, penetration. That is true of the offense. (See Pen. Code, §§ 261, 263.) It is true as well of the special circumstance. (See *id.*, § 190.2, subd. (a)(17)(iii) [expressly incorporating Pen. Code, § 261].) To be sure, the People introduced evidence that allows speculation that unconsented-to sexual

intercourse might perhaps have occurred. But the evidence simply does not make a prima facie showing that it did.

For the reasons stated above, I would reverse defendant's conviction for the rape of Olga Cannon and set aside the related felony-murder-rape special-circumstance finding.

Broussard, J., and Kennard, J., concurred.

Appellant's petition for a rehearing was denied May 29, 1991.