116 Cal.Rptr.2d 353 (2002)
95 Cal.App.4th 1241
The PEOPLE, Plaintiff and Respondent,
v.
Bobby MONTAQUE, Defendant and Appellant.
No. B149225.
Court of Appeal, Second District, Division Seven.
February 5, 2002.
Review Denied May 1, 2002.[**]
*354 Charlotte E. Costan, Burbank, under appointment by the Court of Appeal, for Defendant and Appellant.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Senior Assistant Attorney General, Marc E. Turchin, Supervising Deputy Attorney General, and Sharlene A. Honnaka, Deputy Attorney General, for Plaintiff and Respondent.
Certified for Partial Publication[*]
BOLAND, J.[***]

INTRODUCTION
Appellant Bobby Montaque challenges his convictions for murder, assault with a semi-automatic firearm, and shooting at an occupied vehicle on the ground the trial court erroneously admitted his confession in violation of Miranda v. Arizona, refused to instruct the jury it could request readback of testimony, admitted anonymous handwritten rap lyrics and a photograph album found in appellant's room. He also argues the prosecutor's late disclosures of a witness's background as a police informant violated appellant's constitutional and statutory discovery rights. We conclude substantial evidence supports the trial court's finding that appellant knowingly and voluntarily waived his Miranda rights. Because the prosecutor's tardy disclosures about a witness simply pertained to past incidents in which he was a percipient witness or crime victim, no discovery violation occurred. While the trial court erred in refusing to inform the jury it could request readback of testimony and in admitting the photo album and rap lyrics, the errors were harmless in light of the strong evidence against appellant.

BACKGROUND AND PROCEDURAL HISTORY
On November 19, 1999 at about 8:00 p.m., Lee Arnold and his friend Gregory Johnson were outside the home shared by Arnold and his uncle, Russell Spratt, in the 3600 block of West 105th Street. Appellant[1] and another man rode up on bicycles and asked Arnold and Johnson where they were from. In response to Arnold's denial of gang affiliation, appellant's companion crossed his arms and revealed a gun. Arnold ran to the backyard and jumped in a pen with his two Rottweilers. Appellant and his companion laid down their bikes and followed Arnold to the back yard. *355 They asked Arnold's cousin, whom they encountered as they entered the yard, if he had seen anyone. After a few minutes, Arnold's cousin informed him the men were gone.
Spratt looked out his window and saw his nephew Jausquin Spratt talking to two men. He then saw Arnold emerge from the dog pen and run to the back door. Arnold told Spratt he had been chased by a man armed with a gun. Spratt called 911. While he was on the phone, he heard several gunshots coming from behind the house, in the direction of 104th Street. When the police arrived they took the bicycles left near Spratt's garage by appellant and his companion.
Appellant and a gang member known to Spratt as Spider arrived at Spratt's house by car five to ten minutes after the police left. Spratt recognized appellant as the friend of a nephew and someone he had seen around the neighborhood. Spider asked Spratt if he had seen the bicycles, and Spratt told him the police took them. Appellant and Spider told Spratt he had better get the bikes back, and that if he said anything to the police, they would kill him. As they drove away, a second car drove up and a passenger shouted that if Spratt spoke to the police, they would return and kill everyone in the house.
Spratt testified Spider appeared to be about 23 years old. He was 6'2" tall and had a moustache, slight beard and long braids. When seen by Spratt he was wearing black clothing, gloves and a stocking cap. Spratt described appellant as 15 to 16 years old, about 5'8" or 5'9" tall, bald, and wearing black shorts and black and white Converse All Star shoes. Spratt identified appellant and Spider from a display of photographs and identified appellant at trial. Arnold testified appellant wore a black sweatshirt, brown shorts, and black and white Converse All Stars; he described appellant as 19 to 20 years old, thin, and bald. According to Arnold, appellant's companion was slim, dressed in black, 25 to 30 years old, with long hair worn under a hood, and wearing one glove. Arnold identified appellant, but not Spider, from photographs. He declined to identify appellant at trial, saying he did not want to be known as a "snitch."
Around 8:00 p.m., Kisione Tuihalamaka and his nephew, Vuna Toia, walked from their apartment building in the 3700 block of West 104th Street to the family van parked on the street. A few minutes later, Tuihalamaka's wife, Kafoatu, and his daughter, Tuutanga, joined them and the four got into the van. Tuutanga testified that as she and her mother were walking toward the van, two African-American boys passed them. Because they were walking the same direction, she did not see their faces, though one had long hair and the other had no hair. After her family got in the van, she saw one of the boys turn around and walk toward the van. As the van started to drive away, someone began shooting into the van through the window. Toia was shot five times and died. One shot hit Tuutanga, who survived. No one from the Tuihalamaka family was able to identify the shooter. However, Tuutanga told police the man who approached the van was bald, 16 to 19 years old, thin, 5'8" to 5'10" tall, and dressed in a dark sweater and pants. Kafoatu Tuihalamaka gave the police "a similar description," and said the shooter was bald.
Ballistics testing established that the same 9-millimeter semi-automatic gun fired all four expended casings found at the scene and in the van, two bullets removed from Toia's body, and an expended bullet found in the van.
Detective Stephen Seyler interviewed appellant on December 1, 1999. A videotape *356 of the interview was played at trial. During the interview, appellant admitted he was a member of the Crenshaw Mafia gang. He told Detective Seyler he was walking on 104th Street on November 19, 1999, when two men frightened him by behaving aggressively toward him. He ran back to his own neighborhood. Armed with guns, he and Spider went back on bicycle to look for the men who scared him. They parked the bikes on 105th Street and waited near the apartments on 104th Street. Two men emerged and walked to a van. Appellant thought one of them might have been one of the men who previously confronted him. Appellant walked to the passenger window and fired about four shots. Spider was also shooting. When they went back to get the bikes, a man told them the police had them.
Appellant told Seyler he was wearing a pair of black Converse shoes the night of the shooting. The police searched appellant's room pursuant to a warrant and seized a pair of black and white Converse shoes. The soles of the shoes, however, did not match any of the footprints found at the crime scene. The police also found on the dresser in appellant's room a photograph album that contained photographs of gang graffiti and Blood gang members making gang signs, but apparently no photographs of appellant. They also found handwritten, anonymous poetry or rap lyrics on the dresser. The prosecution's gang expert "interpreted" the lyrics as describing the author as a Blood gang member and referring to gang activities such as selling narcotics and shooting his enemies and those who showed him disrespect.
A jury convicted appellant of one count of first degree murder, three counts of assault with a semi-automatic firearm, and one count of shooting into an occupied vehicle. The jury could not, however, reach a verdict on any of the enhancement allegations, which principally concerned firearm use. The court sentenced appellant to prison for a total of 38 years to life.

DISCUSSION

1.-2.[]

3. The error in refusing to instruct the jury that it could request read back of testimony was harmless beyond a reasonable doubt.
Appellant contends the trial court erred by refusing to instruct the jury it could request read back of testimony. During the instruction conference, the court stated it would not give CALJIC Nos. 1.05[4] and 17.43[5] because the instructions referred to a request for read back, which the court indicated it did not want to encourage.
While the jury did not expressly request read back of any testimony, it did ask, "Can we see the police report taken on the evening of Nov. 19, 1999? Particulary [sic] testimony of the family members that were present in the van." The court denied the *357 request, stating the police report was not an exhibit and therefore was unavailable to the jury.
According to Penal Code section 1138[6], a jury is entitled to rehear testimony and instructions on request during deliberations. (People v. Frye (1998) 18 Cal.4th 894, 1007, 77 Cal.Rptr.2d 25, 959 P.2d 183.) Section 1138 is primarily concerned with the jury's right to be "apprised of the evidence upon which they are sworn conscientiously to act." (People v. Butler (1975) 47 Cal.App.3d 273, 283-284, 120 Cal.Rptr. 647.) The jury's right cannot be waived by defense counsel's acquiescence in the omission of these instructions. (Id at p. 284, 120 Cal.Rptr. 647.) A violation of section 1138 also implicates a defendant's right to a fair trial. (People v. Frye, supra, 18 Cal.4th at p. 1007, 77 Cal.Rptr.2d 25, 959 P.2d 183.)
Numerous cases, including those cited in the preceding paragraph, deal with a claimed violation of section 1138 attributable to a trial court's failure or refusal to honor a jury's read back request. The issue presented in this case, however, appears to be one of first impression. In order to implement a jury's right to be fully apprised of the evidence and to protect the defendant's right to a fair trial, the jury must be informed it may request a read back of testimony. Jury service may be an individual juror's first exposure to the court process. While experienced jurors may be aware they may request read back of testimony, the rights implicated are too important to leave their implementation to chance. Moreover, unless read back is actually requested, a reviewing court is unable to determine whether jurors knew they could request read back or communicated that knowledge to other jurors.
Accordingly, we hold the trial court must inform the jury it may request read back of testimony. The court need not utilize CALJIC Nos. 1.05 or 17.43 for this purpose, but it must, in some fashion, inform the jurors that the read back procedure exists. Thus, the court erred in refusing to instruct the jury.
The record provides no evidentiary support for respondent's contention that the jury was "alerted" it could request read back by the trial court's comment that the jury would be given forms on which "to write the court any notes." While forms could properly be used to request read back of testimony, the comment does not suggest that a request for read back was a type of note the jury might write. Indeed, the note this jury wrote the court suggests confusion about what could and could not be reviewed. Although the jury asked to see the police report, the note referenced a desire to examine the report for the "testimony" of Tuihalamaka family members. Had the jury been aware it could request the read back of testimony, it may have requested a read back of the testimony of either family members or Detective Seyler regarding the family members' statements. Under the circumstances, the note is too ambiguous to support a conclusion the jury knew it could request read back.
Nonetheless, a conviction will not be reversed for a violation of section 1138 *358 unless appellant establishes prejudice. (People v. Frye, supra, 18 Cal.4th at p. 1007, 77 Cal.Rptr.2d 25, 959 P.2d 183.) In view of appellant's properly admitted confession and corroborating evidence, such as the identifications of appellant by Arnold and Spratt and the consistent descriptions given by Arnold, Spratt, Tuutanga and Kafoatu Tuihalamaka placing appellant in the immediate vicinity of the crime scene minutes before and after the shooting, the instructional error was harmless beyond a reasonable doubt. (People v. Jennings (1991) 53 Cal.3d 334, 385, 279 Cal.Rptr. 780, 807 P.2d 1009.)

4. The error in admitting the rap lyrics and photo album was also harmless.[]

DISPOSITION
The judgment is affirmed.
We concur: JOHNSON, Acting P.J., and PERLUSS, J.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of "Discussion" sections 1, 2, and 4.
[**] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977).
[***] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.
[1] Arnold knew appellant by his gang moniker, Bobby Johnson. Shown a photographic lineup, Arnold identified appellant as "Bobby Johnson."
[] See footnote *, ante.
[4] CALJIC No. 1.05 states, in pertinent part: "[S]hould any discrepancy exist between a juror's recollection of the evidence and a juror's notes, or between one juror's recollection and that of another, you may request that the reporter read back the relevant testimony which must prevail."
[5] CALJIC No. 17.43 states, in pertinent part: "During deliberations, any question or request the jury may have should be addressed to the Court [on a form that will be provided]. Please understand that counsel must first be contacted before a response can be formulated. If a readback of testimony is requested, the reporter will delete objections, rulings, and sidebar conferences so that you will hear only the evidence that was actually presented. Please understand that it may take time to provide a response. Continue deliberating until you are called back into the courtroom."
[6] Penal Code section 1138 states, "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."
[] See footnote *, ante.