Filed 6/2/15  In re Henry V. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| In re HENRY V., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> HENRY V., <br><br> Defendant and Appellant. | G049722 <br><br> (Super. Ct. No. DL048686) <br><br> ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed on May 8, 2015, be modified in the following particulars:

On page 11, the second full paragraph is deleted and replaced with the following:

"With respect to Doe's statement, the Attorney General argues the juvenile court properly admitted Doe's statement but for the wrong reason.  The Attorney General contends the court should have admitted the statement not for the nonhearsay fresh complaint purpose but instead for its truth as a spontaneous statement pursuant to

Evidence Code section 1240.  Although the prosecutor raised this issue in her trial brief, the brief contained minimal analysis of this particular issue.  Additionally, the prosecutor did not assert this ground as a basis of admissibility during the contested jurisdictional hearing or when the juvenile court ruled on Henry's motion to dismiss.  Thus, we cannot resolve this issue because it was not fully litigated below and its factual bases are not fully set forth in the record.  (*People v. Boyer* (2006) 38 Cal.4th 412, 449 [may not resolve issue on appeal if not litigated below when factual bases not set forth in record]; Evid. Code, § 354, subd. (a).)"

This modification does not effect a change in judgment.

The petition for rehearing is DENIED.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


ARONSON, J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re HENRY V., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>HENRY V.,<br><br>    Defendant and Appellant. | G049722<br><br>(Super. Ct. No. DL048686)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Cheryl L. Leininger, Judge.  Reversed.

Wayne C. Tobin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Marilyn L. George, Deputy Attorneys General, for Plaintiff and Respondent.

Henry V. appeals from the dispositional order declaring him a ward of the court (Welf. & Inst. Code, § 602) after the juvenile court found he committed rape by the use of drugs and oral copulation by anesthesia or controlled substance. Henry argues the following: (1) the prosecution failed to satisfy the corpus delicti rule; and (2) his statements were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Because we agree with his first contention, we need not address his second claim. We reverse the order.

FACTS

*The Party*

L.R. was a high school senior in May 2013 when he had a party at his parents' home while they were away. About 15 people attended the party. L.R.'s classmate and friend, Henry, was at the party. Another of L.R.'s friends arrived at the party with two males and three females, including Jane Doe and her sister K.Y. L.R. told everyone he would not allow any "sexual relationships" in his house.

Doe was intoxicated when she arrived at the party. Doe smoked marijuana and continued to drink heavily to the point she could not walk normally. At one point, she was lying on a lounge chair in the backyard trying to fall asleep. Henry's friend, U.G., sat down next to Doe. U.G. said to Doe, "DTF," which meant, "Down To Fuck?" as a joke to see how intoxicated she was. Doe did not respond.

Around midnight, L.R. opened a sofa bed for Doe and her friends. At one point, Doe's friend, J.R., and K.Y. helped Doe to the bathroom and laid her on the floor next to the toilet. L.R. went to the bathroom and found Doe lying on the bathroom floor. He asked her if she was okay. Doe said: "'Yes. Leave me alone. Turn off the lights. I'm fine.'" Later, Doe came out of the bathroom and lay down on the sofa. Doe slurred her words when she talked. Doe said she needed to return to the bathroom.

J.R. put Doe's arm over her shoulder and walked her to the bathroom. As they walked, Henry appeared and told J.R. that he could help her with Doe. J.R. said she

2

did not need help, but Henry insisted. Henry put Doe's other arm over his shoulders and they walked her to the bathroom. Henry took Doe into the bathroom; J.R. did not go in with them. The door closed but J.R. did not know if the door was locked. Henry appeared to J.R. to be sober and friendly. J.R. went to find K.Y., but she did not go back to check on Doe. J.R. thought Henry was in the bathroom with Doe for "an hour or less."

About 15 minutes later, L.R. went to the bathroom to check on Doe. She was lying on the floor, and Henry was sitting on the side of the bathtub. L.R. tried to persuade Henry to leave the bathroom but he was unsuccessful. L.R. checked on Doe four or five times. He found the bathroom door closed but unlocked. However, on the second or third visit, the bathroom door was locked. L.R. used a coin he had in his pocket to open the door. He knocked before he opened the door. L.R. thought it was strange for Henry to remain in the bathroom with someone he did not know and asked him what he was doing in the bathroom. Henry repeatedly said: "'I don't know. Someone has to take care of her.'" Henry also appeared tired and about to pass out. Every time L.R. checked on her, Doe wore the same clothes she had on when she arrived.

U.G. went to the bathroom to check on Doe four or five times. Each time, the bathroom door was closed but not locked. During the second visit, Doe was sitting on the toilet with her pants down while her sister K.Y. stood next to her. Henry remained in the bathroom. During the third visit, U.G. took a photograph of Doe lying on the bathroom floor. Henry was in the bathroom but out of the camera's view. During the fourth visit, U.G. could open the door only slightly because Henry and Doe were sitting on the floor next to each other; Henry had his arms around Doe. U.G. asked if he could use the bathroom. After they slid over, U.G. could see Doe was awake but he could not tell if she moved on her own. U.G. changed his mind about using the bathroom because it was awkward. The last time U.G. went to check on Doe, L.R. was "[t]rying to get everybody out."

3

Henry left the bathroom when someone arrived with food. L.R. estimated Henry was in the bathroom with Doe for 30 to 40 minutes. After Henry left the bathroom, L.R. stopped checking on Doe. Doe spent the rest of the night in the bathroom.

*The Following Morning*

While at Doe and K.Y.'s house the following morning, Doe told K.Y. and J.R. that Henry sexually assaulted her.[1] Doe was not crying, but she was "really quiet."

*Investigation*

About three months later, Orange County Sheriff's Department investigator Lavinia Vega interviewed Doe, who provided details about being sexually assaulted at a party when she was intoxicated. Doe identified Henry as her attacker.[2] Vega also interviewed L.R. at his home. He showed Vega the bathroom. L.R. told Vega that every time he tried to talk to Henry about what had happened the night of the party, Henry changed the subject. L.R. also said that three or four months earlier, he noticed Henry remained sober at parties while girls got drunk.

Three months later, Vega interviewed 17-year-old Henry at his high school in an office. Investigator James Christian accompanied Vega. Vega told Henry they were going to close the office door for his privacy but they could leave it open if he wanted. Henry did not object. Vega also told Henry he did not have to talk to them if he did not want to and she asked him: "Are you good talking to us?" Henry answered, "Yeah." Vega told Henry a girl had reported he had sex with her in a bathroom during a party. Henry denied it. Vega told Henry he was "not in any trouble," but he needed to

---

[1] As we explain below, the juvenile court admitted this evidence for a limited purpose.

[2] After defense counsel objected on hearsay grounds, the juvenile court admitted this statement for its effect on the listener.

tell them what happened. Henry stated he went to a party at L.R.'s house but he did not drink much. He said there were a couple girls there whom he spoke with but he slept in his friend's room "[s]o, there was like no way [he] would have had sex with her." He added there were 10 to 15 people at the party and a couple guys and a few girls arrived but he did not talk to them because he did not know them. He said U.G. spoke with a girl who was lying down on a lounge chair. He stated that after he ate, he went to sleep in his friend's room. He again denied having sex with a girl at the party.

Vega asked Henry why the girl said he had sex with her. Henry responded: "She was like unconscious. She was like throwing up in the bathroom the whole time." Henry claimed he knew that because everyone at the party was talking about it. After Henry again denied having sex with the girl, Vega told him a sexual assault exam had been administered on the girl. Vega asked Henry whether his DNA would be found on the girl's body, and Henry said it would because she fell and he helped her up. Vega told Henry that she knew he had sex with the girl because the exam revealed semen on her body. Henry admitted they kissed but denied having sex. When Vega asked how the semen got on the girl, Henry said she gave him a "hand job." Vega asked him how an unconscious girl could do that, and Henry said she became unconscious "[t]owards the end of the night."

After Henry repeated his story from the beginning at Vega's urging, Vega asked Henry to tell her about putting his penis in Doe's mouth. Henry denied doing that. Christian asked how long his penis was in Doe's mouth, he responded, "Not long[,]" and "[s]he only sucked it once." Vega said she knew he got on top of Doe, they "spoon[ed]," and he unsuccessfully tried to put his penis in her "butt." After Vega said his DNA was found on "those places," Henry admitted "[he] grabbed her butt." Vega said she knew Henry dragged Doe on the floor, opened her legs, got on top of her, and put his penis in her vagina. Henry denied this and denied removing her pants and underpants. Henry said people were walking in and out of the bathroom the entire time. Vega said she knew

5

that he locked the door.  Henry initially claimed L.R. locked the door, but he eventually admitted L.R. only closed the door.

Vega could see Henry was becoming emotional and she asked him "to come clean."  Vega said he had taken "an opportunity with a drunk girl."  Henry nodded his head in agreement and agreed to start from the beginning.  Henry said it was U.G. who asked Doe whether she was "down to fuck."  Henry explained he and Doe went to L.R.'s room to make out, but he told them to leave.  He stated they went into the bathroom and she masturbated him until he ejaculated.  He said after they drank more alcohol, Doe went into the bathroom to vomit, and he and others went into the bathroom to check on her.  Henry said that he lay in the bathtub to go to sleep until a friend asked him to come out.

Vega asked Henry when he put his penis in Doe's mouth, he said, "That was the second time in the bathroom."  Henry said he lay down on the floor next to Doe in a spooning position and asked her if she would "give [him] head."  He said she agreed "but she only sucked it like once and then she just stopped."  Henry admitted he put his hand down Doe's pants inside her underpants but he only touched her clitoris.  He denied penetrating her with his finger.  After Henry denied having sex with Doe, Vega asked him how semen got into her vagina.  Henry claimed he ejaculated onto a napkin and some of his semen got onto his hands before he "fingered her."  When Vega asked Henry if he ejaculated a second time because she knew he "ejaculated on her stomach and her legs[,]" Henry initially said "no" but then said he could not remember because he "was drunk too."  When Christian asked Henry why he was lying, he said, "I don't want to get in trouble."  Christian asked how long his penis was in Doe's vagina, and Henry said, "It like wouldn't fit in it like wouldn't go in so like it was only like twice."  Henry said just the tip of his penis went in because "it wasn't like wet."  Henry said that is when he asked and Doe agreed to perform oral sex on him.  He added, "after that that's when [he] fingered her."

6

Henry agreed he masturbated until he ejaculated on her stomach and legs. Henry said he lied because he did not want to get into trouble. Henry said Doe was not unconscious because she talked to him. Henry agreed when Christian said that while Doe had not said "no," that "she was in no condition to say yes." Vega told Henry she was going to arrest him and walk him to her car but she was going to be discreet so as not to embarrass him in front of his classmates.

Days after the interview, a petition alleged Henry committed the following offenses: rape by use of drugs (Pen. Code, § 261, subd. (a)(3))[3] (count 1), sexual penetration by a foreign object by intoxicating and controlled substance (§ 289, subd. (e)) (count 2), oral copulation by anesthesia or controlled substance (§ 288a, subd. (i)) (count 3).

Tragically, 16-year-old Doe died in a traffic accident before the contested jurisdictional hearing was held in this matter.

At the contested jurisdictional hearing, L.R., J.R., L.V., and U.G. all testified to the facts we describe above.

With respect to Doe's statement the morning after the party, when the prosecutor asked J.R. what Doe told her and K.Y., defense counsel objected on hearsay grounds. The prosecutor answered the statement was not offered for its truth "but at this point we don't know what the fresh complaint was without some context." The court overruled the objection, ruling, "At this point it's coming in for the nonhearsay fresh complaint." J.R. testified to the following: "[Doe] told me that he had like stuck his private in her mouth and started doing the motion, and then said that he, I mean, put it in her, I guess, like started having sex with her."

Vega testified concerning her interview of 17-year-old Henry. Vega explained she and Christian interviewed Henry in an office at his high school. She said

---

[3]     All further statutory references are to the Penal Code, unless otherwise indicated.

neither she nor Christian were in uniform. She was not armed but she did not remember whether Christian was armed. She described the office as being 10 feet by 12 feet and having a desk, a couple chairs, and some bookcases. She testified she told Henry that she was going to close the office door, which led to a reception area, for his privacy, but they could leave it open if he preferred. She stated Henry sat in the chair that was closest to the office door the entire interview. Vega told Henry that he did not have to speak with them and he acknowledged he understood. She said neither she nor Christian ever made any showing of force or raised their voices at him. She said Henry never asked to leave. She said she did not handcuff Henry until they got to her car.

On cross-examination, Vega testified Doe did not have a sexual assault examination and there was no DNA evidence found on her body. Vega admitted some of things she told Henry during his interview were not true, including that she interviewed everyone at the party, some of his friends said he had sex with a girl at the party, his semen was found on her body and in her vagina, people saw Doe lying in the bathroom with her pants and underwear off or down. On redirect examination, Vega testified Henry never asked for his parents or a lawyer.

The photograph U.G. took, exhibit No. 5, showed Doe lying on the floor wearing pants but her underwear showed above her pant line. The audiotape of Henry's 53-minute interview was played for the juvenile court.

At the close of the prosecutor's case, Henry moved to dismiss all three counts for insufficient evidence pursuant to Welfare and Institutions Code section 701.1 because there was no evidence of corpus delicti. Henry argued that other than his statements, there was no evidence he sexually assaulted Doe. The prosecutor argued the following evidence permitted the reasonable inference a crime occurred: Henry left his friends and took a girl who was extremely intoxicated and who he did not know into a bathroom and closed the door to presumably take care of her; on at least one occasion the bathroom door was locked; Doe was so intoxicated she could not take care of herself; and

8

Henry eventually left Doe in the bathroom without later checking on her, which suggests he was finished with the sexual assault. The prosecutor also stated Henry's contradictory statements to police indicate a consciousness of guilt. Finally, the prosecutor asserted Doe made a complaint the following morning. Henry argued the evidence the prosecutor relied on was too speculative to establish corpus delicti. He added Doe's statement the following morning was not offered for its truth.

The juvenile court stated it had reviewed the facts of the case and studied the relevant case law. With regard to Doe's statements, the court stated: "[T]he court is considering the fresh complaint not for the truth of the matter asserted but for purposes of fresh complaint and as it is allowed to be considered for purposes of a fresh complaint in conjunction with many numerous things."

The court ruled as follows: "I have quite a long list of things I felt did support corpus, and taking all of those things into consideration then I do believe that there is independent proof, sufficient independent proof, circumstantial proof that is not unreasonable, and it does lead the court to believe that there is a reasonable inference that there has been criminal conduct here. I do find then that there's sufficient corpus in this matter, so . . . [Welfare and Institutions Code section] 701.1 motion based on lack of corpus is denied for that purpose."

The juvenile court found counts 1 and 3 to be true beyond a reasonable doubt. The court found insufficient evidence on count 2 and dismissed it on the court's own motion. At the dispositional hearing, the juvenile court declared the maximum term of confinement was 10 years. The court declared Henry a ward of the court and placed him on supervised probation with various terms and conditions. The court ordered Henry to serve 210 days in juvenile hall with credit for 111 days actually served.

DISCUSSION

Henry argues the prosecutor failed to satisfy the corpus delicti rule. We agree.

9

"In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause. In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant. [Citations.]" (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168-1169 (*Alvarez*).) The corpus delicti rule applies to both out-of-court statements made prior to the offense and to statements made after the offense. (*Id.* at pp. 1170-1171.)

"The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible. [Citations.] There is no requirement of independent evidence 'of every physical act constituting an element of an offense,' so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency. [Citation.] In every case, once the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues. [Citations.]" (*Alvarez, supra,* 27 Cal.4th at p. 1171.)

We review a juvenile court's denial of a motion to dismiss pursuant to Welfare and Institutions Code section 701.1 for substantial evidence. (*In re Man J.* (1983) 149 Cal.App.3d 475, 482.) We must view the record in the light most favorable to the judgment to determine whether the facts and their reasonable inference supports the juvenile court's finding. (*Ibid.*) Thus, we must examine the entire record to determine whether there is "'slight'" or "'minimal'" evidence from which the juvenile court could reasonably infer a crime was committed. (*People v. Jones* (1998) 17 Cal.4th 279, 301 (*Jones*).) "The inference need not be 'the only, or even the most compelling, one . . . [but need only be] a *reasonable* one . . . .' [Citation.]" (*Id.* at pp. 301-302.)

The Attorney General cites to the following evidence to establish the corpus delicti of the sexual assault, i.e., criminal wrongdoing: (1) Doe's statement to K.Y. and J.R. that Henry put his penis in her mouth and vagina; (2) Henry's statements at the party and to investigators that demonstrated his consciousness of guilt; (3) Henry's conduct at, and subsequent to, the party. We will address each in turn.

With respect to Doe's statement, the Attorney General argues the juvenile court properly admitted Doe's statement but for the wrong reason. The Attorney General contends the court should have admitted the statement not for the nonhearsay fresh complaint purpose but instead as a spontaneous statement pursuant to Evidence Code section 1240 for its truth. We disagree. The prosecutor did not present this theory of admissibility below and cannot now advance it on appeal. (*People v. Ervine* (2009) 47 Cal.4th 745, 779 [defendant could not argue new hearsay exception applicable because he did not argue that theory of admissibility at trial; citing Evid. Code, § 354].) To allow the Attorney General to raise this new theory of admissibility would be unfair to Henry.

The Attorney General also relies on Henry's statements at the party and to investigators demonstrating his consciousness of guilt. The Attorney General cites to the following statements: (1) Henry told L.R. he was in the bathroom to take care of Doe but also conveyed the "message" he was tired and wanted to "'pass out'" in the bathroom; (2) Henry initially told investigators L.R. locked the bathroom door but then said L.R. closed the door but it was not locked; (3) Henry initially told them he was not drunk but when asked whether he ejaculated onto Doe he said he was too intoxicated to remember; and (4) Henry first told them he took care of Doe but then said he and others walked in and out of the bathroom to check on Doe. The Attorney General's reliance on these statements, like its reliance on Henry's admissions of guilt, is misplaced. *Alvarez* makes clear "the prosecution cannot satisfy [the corpus delicti] by relying *exclusivel*y upon the extrajudicial *statements*, confessions, or admissions of the defendant[]" and this applies to a defendant's extrajudicial statements before and after the offense. (*Alvarez, supra,*

11

27 Cal.4th at pp. 1170-1171, italics added.) Thus, we cannot consider Henry's statements demonstrating his consciousness of guilt to determine whether the prosecutor satisfied the corpus delicti rule, and we are left with only Henry's *conduct* to satisfy the corpus delicti rule.

With respect to Henry's conduct, the Attorney General relies on the following: (1) Doe was extremely intoxicated; (2) Henry insisted on helping Doe to the bathroom despite the fact Henry did not know Doe; (3) When they reached the bathroom, Henry and Doe remained in the bathroom with the door closed; (4) At some point, the bathroom door was locked for an unknown period of time and L.R. used a coin to unlock the door; (5) Henry and Doe remained in the bathroom for 30 to 45 minutes despite not previously knowing each other; (6) Despite evidence Henry wanted to take care of Doe, Henry left the bathroom when someone returned to the house with food, ate, and went to sleep without returning to the bathroom; (7) When L.R. subsequently asked Henry what happened at the party, Henry changed the subject; and (8) L.R. subsequently saw Henry at parties where girls were drunk and Henry did not drink.

Acknowledging this is a "low" or "slight" evidentiary standard, we conclude that even when viewed collectively, this evidence does not establish Doe suffered an injury or harm. Although Henry helped an extremely intoxicated Doe into the bathroom and they remained secluded there for more than 30 minutes at one point with the door locked, we cannot conclude this evidence establishes criminal wrongdoing. At least three people entered the bathroom and not one person saw Henry and Doe engaged in any sexual relations. Nor did anyone see either of them in any state of undress. Both L.R. and U.G. testified they each went into the bathroom at least four times and neither of them witnessed any inappropriate conduct.

The Attorney General claims "[L.R.] was concerned that [Henry] might be trying to take sexual advantage of the intoxicated [Doe], that was why he kept checking on [Doe] in the bathroom while [Henry] was with her." We do not read the pages the

12

Attorney General cites to as fairly supporting her claim. The evidence amply demonstrates L.R. did not want partygoers engaging in sexual relations in his home and that he told them so when arriving at the house. When asked why he picked the lock, L.R. said, "Well, anything could happen in there . . . ." He did not say he suspected Henry was forcing himself on Doe. Simply put, no witnesses observed Henry and Doe engaging in sexual activity, and there was no physical evidence of sexual contact.

Additionally, there was no physical evidence establishing Doe was sexually assaulted. The evidence demonstrated Doe was intoxicated when she arrived at the party and she continued to drink alcohol and smoked marijuana, but there was no evidence she engaged in sexual activity in the bathroom. That Doe's underwear was showing above her pant line at one point does not establish she was sexually assaulted. There was no evidence her pants were pulled down other than when she used the toilet. Although Henry's conduct of remaining in the bathroom while Doe used the toilet was inappropriate, it was not evidence of sexual assault. Moreover, Henry's clothes showed no evidence of sexual activity.

Finally, Henry's subsequent non-responsiveness to L.R. and his sobriety at parties does not establish criminal wrongdoing even when viewed collectively with evidence of his conduct at the party. When viewed collectively, Henry's conduct did not exemplify that of a gentlemen, but neither did it demonstrate criminal wrongdoing sufficient to reasonably infer Doe suffered an injury.

A review of California Supreme Court cases where the court concluded the prosecutor had made the requisite showing of corpus delicti illustrates the dearth of evidence here. In *Jones, supra,* 17 Cal.4th at page 302, the victim, who had been shot in the head, was found on a dirt roadway but died without describing what had happened. There were bruises on her thighs, knees, legs, and perineal area, as well as injuries on her hands. Semen was present in her vagina, on her external genitalia, and in her rectal area, but not in her mouth. An expert testified those results were not inconsistent with oral

13

copulation because of the mouth's natural rinsing processes.  The victim was found without underpants, a bra, or shoes, although evidence showed she customarily wore those items.  The Supreme Court determined the circumstantial evidence of multiple forcible sex acts satisfied the requisite prima facie showing, rejecting defendant's contention oral copulation was not established without the presence of semen in the victim's mouth.  (*Id*. at p. 302.)

In *People v. Jennings* (1991) 53 Cal.3d 334, 366 (*Jennings*), defendant argued among other things, the prosecution failed to establish the corpus delicti of rape.  The court acknowledged "the evidence of rape was not strong[]" because no seminal fluids were found on the victim's body, no evidence of penetration existed, and there was "no evidence that the victim's clothes were arranged in such a manner as to suggest a sexual assault."  (*Id*. at p. 367.)  The Supreme Court held the prosecutor established the corpus delicti of rape based on the evidence of a woman's body being found unclothed in a remote site with a broken jaw.  (*Id*. at pp. 367-368.)  The court reasoned that when a "young woman is found unclothed in a remote locale, an inference arises that some sexual activity occurred."  (*Id*. at p. 367.)  The court opined the condition of the body at the time of discovery permitted a reasonable inference that, "whatever sexual activity occurred, it occurred against the victim's will."  (*Id*. at p. 368.)

The corpus delicti of the offense in *Jones*, oral copulation, and *Jennings*, rape, was at issue in both cases because there was no direct evidence the sexual assault occurred.  But in both those cases there was other evidence from which the trier of fact could reasonably infer the victim suffered an injury or harm.  In *Jones*, it was the victim's state of undress and evidence of other sexual offenses that established the corpus delicti of oral copulation.  (*Jones, supra,* 17 Cal.4th at p. 302.)  In *Jennings*, it was the fact the victim was found unclothed in a remote location.  (*Jennings, supra,* 53 Cal.3d at p. 367.)  *Jones* and *Jennings* illustrate the point that although the evidentiary standard is low, the prosecutor still must offer some evidence the victim suffered an injury or harm.  Here, as

14

we explain above, the record includes no evidence, other than Henry's statements, Doe suffered any injury or harm. Unlike *Jones* and *Jennings*, there was no evidence from which to reasonably infer Doe was sexually assaulted.

Although we acknowledge the prosecutor need only offer "'slight'" or "'minimal'" evidence and this is a low threshold (*Jennings, supra,* 53 Cal.3d at p. 368), based on this record we cannot conclude the prosecutor offered sufficient evidence to establish criminal wrongdoing. But for Henry's statements, there would be no basis to indicate there was any sexual conduct, consensual or otherwise, in the bathroom. There was no evidence Doe suffered an injury, loss, or harm, let alone one by criminal agency. Thus, the prosecutor failed to satisfy the corpus delicti rule.

DISPOSITION

The order is reversed.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


ARONSON, J.


15